COMMONWEALTH vs. ALBERT J. CINCOTTA.

Norfolk.  October 4, 1979. — December 19, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Identification.  Robbery.*

There was no error in the denial of a pretrial motion to suppress testimony
    identifying the defendant which might be given by a teller and the
    branch manager of a bank who observed the perpetrator of an armed
    robbery there and who subsequently described him to detectives and
    made photographic identifications of him "through police photos" and
    live identifications when he was sitting alone wearing ordinary civil-
    ian clothes just before a probable cause hearing.  [392-397]

INDICTMENT found and returned in the Superior Court on
August 5, 1976.

A pretrial motion to suppress evidence was heard by
*Brogna*, J., and the case was tried before *Bonin*, C.J.

After review by the Appeals Court the Supreme Judicial
Court granted leave to obtain further appellate review.

*P. J. Piscitelli* for the defendant.

*Charles J. Hely*, Assistant District Attorney, for the Com-
monwealth.

KAPLAN, J.  The defendant Cincotta, indicted for armed
robbery with "features artificially distorted" (G. L. c. 265,
§ 17), moved before trial to suppress testimony that might
be given by two women who were present at the robbery
and observed the defendant there, and subsequently made
photographic and in-person identifications of the defend-
ant.  After a hearing at which these women and a police
detective testified in detail, a judge of the Superior Court
made findings and denied the motion.  A single justice of
this court denied the defendant's application for in-
terlocutory appeal of the order of denial.  Substantially
similar identification testimony was received at trial.  The

defendant was convicted[1] and the Appeals Court affirmed, overruling, among other assignments of error, the claimed error in the failure to suppress the questioned identifications. *Commonwealth* v. *Cincotta*, 6 Mass. App. Ct. 812 (1979). We granted an application for further appellate review. 377 Mass. 920 (1979). We reach the same conclusion as the Appeals Court regarding the identifications, although a part of our explanation differs somewhat from theirs. We agree that other claimed errors are without merit.

Like the Appeals Court, we accept the motion judge's subsidiary findings as warranted by the evidence. And we owe respect to his conclusions of law although we are not bound by them. See *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978). Our references to the facts in this opinion draw on the findings, amplified by some recourse to the detailed evidence. An armed man with face and hair blackened[2] entered the Quincy branch of the First Federal Savings and Loan Association on July 19, 1976, about 10:40 A.M. Cindy Carmusin, a teller, was at her station. Helen Sands, the branch manager, was in the ladies room. No one else was in the bank at the time. The robber vaulted over the counter and pointed a gun at Carmusin and ordered her to lie down on the floor. Emerging from the rear of the bank, Sands was grasped by the robber and also forced to lie down. Nevertheless both women were able to make observations of the robber at close range.[3] The robber remained in the bank for four or five minutes. According to the findings, the witnesses "had ample opportunity . . . to view [the robber's] stature and facial characteristics."

Detectives Thomas Casey and Thomas Healy arrived quickly on the scene and Sands and Carmusin separately

---

[1] He was sentenced to five to seven years' imprisonment at the Massachusetts Correctional Institution at Walpole.

[2] Which accounts for the indictment under the statute for robbery with features artificially distorted.

[3] Sands said she had three chances to see the robber's face; Carmusin probably had the same number.

gave them roughly similar descriptions of the intruder.[4] On the same day, Sands assisted the police in composing a picture of the man by the Ident-a-kit method; Carmusin was not helpful in this respect.[5] Sands was also shown more than 100 photographs. She did not identify any as the robber. In fact the defendant's picture was not in the array. Four days later, the detectives appeared at the bank with ten photographs. Sands, after examining them for about ten minutes, picked out the defendant's picture. Carmusin was then shown the ten photographs and after perhaps lengthier reflection she also selected the defendant's picture but said she was not certain and wanted to see the man in person.[6]

The two women appeared at Quincy District Court under subpoena on July 29, the occasion of the probable cause hearing. They sat in the front row of the court room. Seated by himself, on a bench at right angle to the spectators' benches, was the defendant. Sands, upon seeing the defendant, immediately said to one of the detectives sitting near her, "That's him." Carmusin also promptly and separately identified the defendant as the robber. At the probable cause hearing which then occurred, Sands took the stand and testified; Carmusin, sequestered on motion of the defendant's counsel, was not called.

With respect to the photographic identifications at the bank, it is argued that, as the detectives presented only ten pictures, they were implicitly suggesting that they had themselves reduced the field and believed the guilty man was in this gallery. Some possible implication that the police thought they might be closing in on the culprit was unavoidable, but the showing was part of "an ongoing proc-

[4] Sands's description was quite full, Carmusin's somewhat less so. Although the detectives first spoke briefly to the two women together, descriptions were apparently elicited from them separately.

[5] It is indicated that Carmusin was emotionally upset when asked to assist with the composite. Carmusin did not see the composite until after the probable cause hearing, and then only by accident.

[6] Apparently the detectives did not inform the women that their identifications tallied.

ess of looking through police photos" (*Nassar* v. *Vinzant*, 519 F.2d 798, 801 [1st Cir.], cert. denied, 423 U.S. 898 [1975]), and cannot be considered offensive to due process. See the more extreme situations in *Commonwealth* v. *Venios*, 378 Mass. 24, 30 (1979); *Commonwealth* v. *Mobley*, 369 Mass. 892, 896 (1976). Bearing down on Carmusin, the defendant says she may have been unduly influenced in her selection by Sands's selection. But the motion judge found that though Carmusin was aware Sands had made a choice, she did not know what it was.[7] In handing the pictures to Carmusin, the police did not single out any one of them, and Carmusin's choice was evidently circumspect, as indicated by her reservation. The motion judge concluded that the photographic identifications by Carmusin and Sands were not given under impermissibly suggestive conditions (although slight suggestiveness there may have been), and it is clear to us, as it was to the Appeals Court, that the defendant did not carry the burden which was upon him to demonstrate the opposite. See *Commonwealth* v. *Venios, supra* at 29; *Commonwealth* v. *Chase*, 372 Mass. 736, 745 (1977); *Commonwealth* v. *Botelho*, 369 Mass. 860, 867 (1976).

As to the live identifications at the District Court six days after the photographic identifications and just before the commencement of the probable cause hearing, the contention is that undue suggestiveness followed from the fact that the defendant, sitting alone, was a natural cynosure of the women's eyes. This, however, was not a situation like that envisioned in *Martin* v. *Donnelly*, 391 F. Supp. 1241 (D. Mass. 1974), and thought unduly suggestive: a contrived confrontation in a court room prior to the arraignment of a suspect, calculated artificially to renew and improve a

---

[7] Perched on her teller's chair nearby, Carmusin could have seen Sands poring over the pictures, but it appears unlikely that she could discern which picture Sands had chosen. Indeed Detective Casey had the impression that Carmusin was engaged in dealing with customers while Sands was examining the pictures. (Of course, the fact that two witnesses jointly view an array of pictures does not necessarily render invalid an ensuing identification. See *Commonwealth* v. *Moynihan*, 376 Mass. 468, 476 [1978].)

witness's memory and bolster any identification he might subsequently make, the suspect and his counsel being unaware, and having no reason to anticipate, that a prospective witness might be present in the court room at the time. See also *Commonwealth* v. *Kazonis*, 356 Mass. 649 (1970). Cf. *Moore* v. *Illinois*, 434 U.S. 220, 229-230 (1977). In the present case, by contrast, we have an unfabricated, common scene of witnesses quite naturally and expectedly appearing in a court room, awaiting the call of a probable cause hearing and seeing the defendant, relatively isolated, moments before the call. No doubt some element of suggestiveness is inherent. See *Baker* v. *Hocker*, 496 F.2d 615, 617 (9th Cir. 1974). But counsel has a responsibility to be alert and, as far as he thinks necessary or useful, to try to eliminate any suggestive influence; thus he may move in advance to have the defendant seated amid the court room audience, or for a lineup. See *Commonwealth* v. *Jones*, 362 Mass. 497, 500 (1972); *Moore* v. *Illinois, supra* at 230 n.5.[8] If precautionary measures are not sought, complaint cannot be later made of suggestiveness. *Commonwealth* v. *Napolitano*, 378 Mass. 599, 603 (1979). *Commonwealth* v. *Jones*, 375 Mass. 349, 358 (1978). The case is comparable to an ordinary identification from the witness stand proper, whether at a probable cause hearing or at trial, which — precautions not having been requested or taken — is in some degree suggestive, but is not for that reason invalidated. See *Commonwealth* v. *Wheeler*, 3 Mass. App. Ct. 387, 390-391 (1975).

---

[8] The granting or denial of such requests rests in the sound discretion of the judge. See *Commonwealth* v. *Pearsall*, 370 Mass. 413, 415 (1976); *Commonwealth* v. *Jones*, 362 Mass. 497, 501 (1972).

In the present case, the defendant has claimed that he was deprived of the benefits of counsel in violation of the Sixth Amendment to the United States Constitution because he was not informed that prosecution witnesses would be on hand at the hearing. The Appeals Court properly held that counsel should have been aware of the likelihood, see 6 Mass. App. Ct. at 820, and cases cited. As noted, counsel did request sequestration of witnesses. On the facts of the case it is unlikely that the defendant would have benefited materially, had the earlier precaution been requested and taken.

We should perhaps add, for completeness, that whereas Sands, the more mature witness, may be assumed to have realized that the man on the bench was the defendant who had been charged,[9] that may well not have been the case with Carmusin, so that her attention was not drawn in any particular direction. She had no experience of courts or court rooms and gave no thought to whether there was an accused who would appear in court; she said in effect that she simply reacted to seeing the man who robbed the bank. An assistant district attorney thoughtlessly asked Carmusin to look around and see if she recognized anyone, but Carmusin testified she did not recall the attorney's remark, and Detective Casey, who was nearby, said the remark came after Carmusin told him that she recognized the defendant.

The motion judge did not say expressly that there was no impermissible suggestiveness in the live identifications — or rather that the defendant failed to establish that there was such suggestiveness — although he probably intended to convey that conclusion.[10] The Appeals Court, taking account of the judge's subsidiary findings on this phase of the case, called the situation "somewhat suggestive." To cancel any doubts, the court then went into the matter of the "reliability" of the identifications, applying the doctrine of *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), and reached an affirmative conclusion. The Appeals Court had some warrant in this court's opinions for assuming that we were favorably disposed toward the *Manson* doctrine and prepared to accept and apply it — the question left open in

[9] Sands was thirty-six years old, Carmusin eighteen. Sands said she saw the defendant being led into the court room, Carmusin said she first saw the defendant as he was sitting on the bench. (The defendant was wearing ordinary civilian clothes.)

[10] The judge denied the entire motion to suppress, including the live identifications, and, in saying that those identifications rested on the witnesses' independent recollections of the man who robbed the bank, he was likely indicating that any suggestiveness at the District Court was minimal or nonexistent. The judge did not mention "reliability" and several times during the suppression hearing indicated that he was interested in suggestiveness, not in the strength or weight of the identifications.

*Commonwealth* v. *Botelho,* 369 Mass. 860, 874-875 (1976). In fact we considered the question still open, as we indicated clearly in *Commonwealth* v. *Venios,* 378 Mass. 24, 27-28 (1979), decided some four months after the Appeals Court's decision of the present case. The present case does not require that we consider any application of *Manson,* as we hold that in the live identifications there was no passing or near passing of the constitutional boundary into fatal suggestiveness. Of course it was for the jury to decide how much weight to attach to these identifications, as well as to the others, when they were admitted at trial.

Identification and alibi were the main issues that developed at trial, and there is no serious claim before us that any of the judge's instructions was deficient. We agree with the Appeals Court that the motion for a directed verdict of acquittal at the close of the Commonwealth's case, and the renewed motion when all the evidence was in, were correctly denied, as was the defendant's motion after verdict for a new trial. Those motions went to the sufficiency of the evidence to support the conviction. To that question the "reliability" of the identifications in the *Manson* sense was pertinent, and therefore we add that we think the Appeals Court's discussion of "reliability" was sound, and although addressed to the evidence adduced at the suppression hearing, also applied to the similar evidence produced before the jury.

*Judgment of the Superior Court
affirmed.*