COMMONWEALTH *vs.* JOSEPH FERNANDES CORREIA.

Suffolk. March 4, 1980. — July 2, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Identification. Due Process of Law,* Identification. *Homicide. Robbery. Practice, Criminal,* Instructions to jury. *Attempt.*

In the circumstances, pretrial photographic identification procedures were not so unnecessarily suggestive as to require suppression of the witnesses' lineup and in-court identifications of the defendant. [77-81]

At the trial of a defendant charged with murder, arising out of his alleged participation in an attempted bank robbery, the judge properly instructed the jury with respect to the defendant's level of voluntary and active participation in the armed robbery attempt as a necessary element of the crime charged. [81-84]

INDICTMENT found and returned in the Superior Court on September 28, 1977.

Pretrial motions to suppress were heard by *Greaney, J.,* and the case was tried before *Lynch, J.*

*Brian Kanner (John Leubsdorf* with him) for the defendant.

*M. Ashley Brown,* Special Assistant District Attorney, for the Commonwealth.

QUIRICO, J. Joseph Fernandes Correia was indicted on September 28, 1977, for murder, arising out of his alleged participation in an attempted bank robbery, during which one Alphonse Puzan, a security guard, was shot and killed. Before trial he filed motions to suppress lineup and expected in-court identifications of him by three persons as a participant in the robbery. After a hearing on the motions which lasted six days, a judge of the Superior Court granted the motions as to one witness, Gary David, and denied them as to two other witnesses, Debra Mark and Mitchell Fischman.

At the defendant's trial, both Mark and Fischman testified to their lineup identifications of the defendant, and identified him in court. He was convicted of murder in the first degree.

The defendant appeals his conviction under G. L. c. 278, §§ 33A-33G, and assigns as error (1) the admission of in-court and out-of-court identifications by Mark and Fischman, and (2) jury instructions relating to the crime of attempted armed robbery. We hold that there was no error, either as to the identification evidence or as to the jury instructions, and, accordingly, we affirm the judgment of conviction.

I. *Findings of Fact by the Motion Judge.*

We review the facts found by the judge on the motion to suppress to the extent necessary to our disposition of this appeal. On February 20, 1976, about 1:57 P.M. the branch office of The First National Bank of Boston, at Government Center, was the subject of an attempted armed robbery by two white males wearing wigs and sunglasses. One of the robbers accosted the bank guard and shot him twice in the chest. The other robber, also armed and carrying a shopping bag, vaulted over the counter into the tellers' area, dropped his gun, retrieved it, and after a few seconds jumped back over the counter without taking any money. Both robbers fled on foot. A shopping bag containing gold-rimmed eyeglasses was found behind the bank counter. A wig and a pair of sunglasses were found behind a column a short distance from the bank.

Debra Mark (Mark) was on duty as a teller at the bank at the time of the robbery attempt. She testified at the hearing on the motion to suppress that she observed the second robber (referred to by the police as "the vaulter") for three to four seconds as he ran toward her, and for an additional nine to fourteen seconds while he was behind the counter, within two feet of her. During this time she was "extremely scared and nervous."

She described the "vaulter" as a white male, five feet eight inches to five feet nine inches tall, 140 pounds, with curly "flyaway" hair, light brown in color with blond

streaks, wearing sunglasses, white gloves, a blue waist-length jacket and blue trousers. She noticed that he had a fair complexion, was agile in his movements, and was carrying a gun.

The wig of light brown hair with blond streaks which was found a short distance from the bank was identified by Mark as similar to the wig worn by the "vaulter" she saw in the bank.

Within a day or two after the incident she further described the "vaulter" to an F.B.I. agent as a white male in his early twenties, no taller than five feet eight inches, with fair eyebrows, a light complexion and "standard features," wearing blue pants, shoes (not sneakers) and sunglasses that kept sliding off his face, and carrying a gun in his right hand.

She subsequently described the person to a different F.B.I. agent as a "white male, early twenties, approximately five foot six inches to five foot seven inches, husky but not fat, light complexion, light brown curly hair, might have worn a wig, sunglasses, blue jacket and blue pants, good teeth, needed a shave."

Mitchell Fischman (Fischman), a customer in the bank when the incident occurred, heard a shot and immediately crouched down where he stood near a customer counter at the far end of the bank lobby. He saw the "vaulter" run toward the tellers' windows, leap through one, and then leap back out and run toward the door. He observed the vaulter from the rear as the latter approached the windows and from the side as he left, and saw him in all for a total of about six seconds. He was then unable to tell with certainty whether the person he saw was male or female, but he obtained a general "impression of the face." He later described the person as a white male in his early twenties, with a thin, elongated face, possibly dark hair, and wearing a dark jacket. Neither Mark nor Fischman had viewed the robber who had fired the shots.

A. *First (Boston Police) Photographic Array.*

Almost immediately after the robbery attempt and shooting, members of law enforcement agencies arrived at the

bank and began an investigation, including interviewing witnesses to the crime. That same afternoon a detective of the Boston police department showed Debra Mark three books containing together over two hundred "mug shot" photographs. In showing the photographs to Mark the detective indicated that she should view the photographs carefully since participants in bank robberies frequently wore disguises. In mentioning this, he pointed as an example to two photographs of the defendant appearing on the first page of one book, one depicting him without a disguise and the other showing him wearing sunglasses and a black wig. The picture showing the defendant with no disguise had been taken some years earlier when he was slimmer and more youthful appearing and had shorter hair. Mark "discounted the pictures immediately" as not showing the man she had seen. Other bank employees also viewed the photograph books and gave descriptions of varying generality to the police, but none made any identification of possible suspects.

B. *Second and Third (F.B.I.) Photographic Arrays.*

As a result of further information and investigation not put in evidence, the suspicion of law enforcement officers began to rest on the defendant and one Stanley Ulatowski as the perpetrators of the crime. The Federal Bureau of Investigation (F.B.I.) prepared two photographic arrays of relevance here. The first was a display consisting of ten photographs of persons wearing wigs and sunglasses (exhibit 2), and included one photo each of the defendant and Ulatowski. This photographic display did not unduly highlight either suspect. The photograph of the defendant was the same one which had been included in the Boston police book of photographs. The motion judge found that, "[d]espite this, it is so dissimilar from the other photos of Correia as to not readily cause a mental correlation and in effect to constitute a separate and distinct photo of him."

The second F.B.I. photographic display (exhibit 3) consisted of various photographs of undisguised individuals, and also included one picture each of the defendant and Ulatowski. The picture of the defendant was the same one

which appeared on the first page of the Boston police photograph book. This display was found to show a fair composition of various faces, hair styles, profiles and complexions consistent with some of the descriptions given by witnesses, and was not unduly suggestive with respect to the defendant.

On February 23, 1976, three days after the crime, Mark viewed exhibits 2 and 3, and was unable to identify anyone shown therein. Fischman was shown exhibit 3 on February 27, 1976, but he too was unable to make any identification. The judge found that the viewing of these arrays had no particular impact on either witness.

C.   *Final (Bank Security) Photographic Array.*

A security agent of the bank prepared a photographic array (exhibit 15) consisting of fourteen photographs. Three of these were of the defendant and three were of Ulatowski. Two of the pictures of the defendant were those included in the Boston police and F.B.I. arrays, and the third depicted him with longer hair and a moustache. Of the other pictures in the display, one was of a black man, although no witness had said that a black man had been involved, and another showed a white man with a crewcut hairstyle. Thus the judge found that the display functionally consisted of twelve photographs, of which three were of the defendant and three of Ulatowski. The judge found this display to be unduly suggestive of the defendant. Mark viewed this display on February 24, 1976, and again was unable to make an identification.

D.   *The Lineup.*

On June 15, 1977, lineups were arranged at District One headquarters of the Boston police department, which were to be viewed by some thirty-six witnesses to five different bank robberies for which the defendant and Ulatowski were under suspicion. Mark and Fischman viewed two lineups, as did other witnesses to the First National Bank incident at issue here. One lineup was for the purpose of seeing if anyone could identify the defendant.

Before the lineups the witnesses were instructed not to talk to the others, and to "think back and recreate in their

minds" what they had viewed at the incident.  They were told to take as much time as they needed in viewing the lineup, and that after each part of the lineup was completed the witnesses could request the standees to perform such exercises as might assist them in making an identification.  They were instructed that they could make identifications even though they were not a "hundred per cent positive" if they felt that certain characteristics of the standees resembled those of the perpetrators, and were told that two suspects would be participating in the lineups.  The witnesses were given identification sheets which they were to complete at the end of the lineups, and were told to place the number of any standee they could identify on the sheet, along with the reasons supporting the identification.  The sheet also included a place to indicate that no identification had been made by the witness.

The first lineup consisted of six males, including Ulatowski and persons who resembled him.  The second lineup, also of six males, included the defendant as standee number five (a position requested by defendant's counsel), and five others more or less resembling him.  The standees could not see the witnesses, who were separated from them by a two-way mirror.

The other standees in the defendant's lineup resembled him in height, build, weight, complexion and facial profile, so as to make the lineup a fair composition.  Although the defendant had the lightest hair of any in his lineup, the hair of some of the other standees was sufficiently light to "fairly comport" with his hair, so that the lineup was not unduly suggestive of the defendant by reason of this factor.

The lineups consisted of three parts.  First, the participants were viewed straight on, and then turned to their left and to their right.  Second, each standee individually approached the mirror behind which the witnesses were stationed.  Third, each standee was required to put on a black wig and a pair of gold-rimmed sunglasses, and again approach the mirror individually.  At the end of the defendant's lineup, Mark requested that each standee extend his

right hand and adjust the sunglasses on his nose with his left hand, as she had seen the "vaulter" do. Fischman requested that each participant in both lineups approach a table and jump up on it, as the "vaulter" had done. Other witnesses to other robberies requested that participants in both lineups be required to repeat certain phrases which the criminals they had seen had spoken.[1] In the course of making these statements, the defendant was requested to repeat certain of such statements two or three times, because he did not say them loudly enough to be heard the first time. One or two other standees were also required to repeat certain of the phrases for the same reason. At another point, the defendant was required to repeat an exercise because one of the videotape cameras filming the lineup had run out of film.

Mark made no identification from the first lineup. As soon as she viewed the defendant in the second lineup, she immediately was sure that he was the person she had seen in the bank, and became "scared upon seeing him" because of her recognition. The exercise with the wigs confirmed her identification. On her lineup identification sheet she indicated that she based her identification on the defendant's facial features, his height, build, coloring and high forehead. She accordingly marked standee five as the person she identified, but she also indicated that another standee also resembled the person she had seen in the bank, because she believed that her instructions were to put down anyone who might have any similarity to the person she saw. Despite this, the judge found that she was absolutely sure that the defendant was the person.

After viewing the lineups Fischman identified the defendant as "resembling the person" he had seen in the bank.

E. *Post-Lineup Interviews.*

Beginning in October, 1977, Mark met two or three times with an assistant district attorney and an investigator from the district attorney's office, at which meetings they showed

---

[1] The statements were: "Everybody hands up," "freeze," "don't do anything and no one will get hurt," and "if anyone follows us I'll kill him . . . ."

her photographs of the lineup, particularly the second line-up, for the purpose of "confirming" her identification of the defendant, in light of her earlier failure to identify him. At one or more of these meetings she expressed reservations about testifying in court and fear of the defendant. The representatives of the district attorney indicated to her that the defendant was a suspect in the case and had been indicted, that her identification was significant because she had had the best opportunity to view the "vaulter," and that other identifications were less firm than hers.

Sometime in December, 1977, Fischman was also visited by an assistant district attorney, shown pictures of the two lineups, and asked to confirm his selection. He was told that the person he had selected, the defendant, would be the subject of later court proceedings, and that Fischman would be called as an identification witness.

The following are additional findings of fact by the judge relevant to the alleged suggestiveness surrounding the Mark and Fischman identifications.

F. *Identification by Debra Mark.*

1. *Viewing of the criminal.* Mark observed the "vaulter" for about two seconds as he ran toward her teller window, about 1:57 P.M., when the bank was well lit. She viewed his full face for three to four seconds, and the left side of his face for an additional six to eleven seconds, from a distance of one and one-half to two feet. She gave the description recited above shortly after the incident.

2. *Viewing of the first (Boston police) array.* When she viewed the three books of photos of the Boston police, Mark was extremely emotional, and cried continually, due to the impact of the recent crime. Although the remark of the detective that she should look carefully because robbers often wore disguises, and his action in pointing to the two pictures of the defendant as an example, contained "some suggestiveness," the two pictures were sufficiently dissimilar as not to focus Mark specifically on the defendant. The comment was made in good faith by the detective as general advice, and he was not attempting to accentuate the de-

fendant (although the defendant was the only person whose pictures appeared in the books both in disguise and without). Because of the large array of pictures (200) and Mark's emotional state, the remark had no impact upon her.

3. *Viewing of the final (bank security) array.* This display was found to be suggestive both of the defendant and of Ulatowski, both of whose pictures appeared three times in it. However, "it apparently made no impression on Mark, since she was unable to make an identification from the display." All photographic displays had been shown to Mark within the week following the incident. Despite the slightly suggestive remark of the Boston police detective and the suggestive display of photographs shown to her by the bank security agent, no impact was made upon her. Her descriptions were consistent as given to different government agents, and were reasonably approximate to the defendant as he appeared in the courtroom in profile, build, and color of skin.

4. *Viewing of the defendant at the lineup.* Although she was told that there would be a suspect in both of the lineups, she felt under no compulsion to make an identification, and her state of mind in viewing them was that there might not be anyone whom she would recognize. She viewed the Ulatowski lineup and knew immediately that she recognized no one in it, and so marked her sheet. As the Correia lineup was being set up, she observed the first four participants and knew immediately that she could identify none of them. She then viewed participants five and six, and immediately recognized the defendant, because of "the face," his height, his build, his high forehead, and his light coloring. The wig exercise helped to confirm her identification. The fact that the wig used in the lineup was different in color and texture from the one found near the bank, and differed sharply from the description of hair color she had given, was of no consequence to her since she based her identification on the other attributes. She placed no reliance on the exercise regarding the sunglasses, which she had requested, in making her identification.

The judge found that Mark's identification was made at a lineup which was fairly conducted, was based upon an adequate opportunity to view the person present in her teller's cage, and was made entirely apart from any suggestiveness that might have existed in the photographic displays.

5. *Post-lineup conversations.* The conversations which the representatives of the district attorney had with Mark "were not purposefully calculated by the agents of the Commonwealth to be suggestive," but were attempts to assuage her fear of testifying in court. Though the subsequent meetings to confirm the identification taken alone would be suggestive, the judge found that they were not sufficient to require suppression of her identification, because it was definite and firm as of the date of the lineup. Whatever suggestiveness existed in the conversations that took place at a later date had no effect on her observations and conclusions as to the identification. Her identification was not influenced in any way by these conversations. The judge therefore permitted her identification to stand.

G. *Identification by Mitchell Fischman.*

1. *Viewing of the vaulter.* Fischman, as noted above, viewed the vaulter for about six seconds, including a rear view for three seconds and a side view for three seconds. The judge found that, brief as it was, Fischman's opportunity to observe was adequate, and that the impressions that the vaulter made on him were such that would cause him to be able to make an identification particularly from the characteristics of the person jumping.

2. *Viewing of the photographic arrays.* Fischman viewed the photograph books of the Boston police department immediately after the incident. He picked out a picture of Ulatowski as "resembling" one of the robbers (although the only robber he saw was the "vaulter"). He later was shown exhibits 2 and 3 by an F.B.I. agent, but made no identification. The judge found that the photographic displays, to the extent that they may have repeated the defendant's picture, "had no bearing on [Fischman] in his

identification by his own statement and from the lapse of time from the last display to the lineup."

3. *Viewing of the defendant at the lineup.* When brought to the lineup, despite being told that there would be two suspects there, Fischman was not of a state of mind where he felt he would have to make an identification. After viewing the jumping exercise, he made an identification of Correia as "resembling the person," based primarily on his general recollection of what he had seen in the bank and the manner in which Correia had jumped up on the table at the lineup. His identification was also based on the shape of the defendant's face, the length of his arms, and the color of his hair. The use of the wig played no part in his identification.

4. *Further findings.* The judge made further findings with respect to Fischman, which are repeated in the margin below,[2] and then ruled that the identification could stand.

II. *Scope of Review of Findings of Fact.*

In *Commonwealth* v. *Dickerson,* 372 Mass. 783, 789 (1977), and again in *Commonwealth* v. *Dougan,* 377 Mass. 303, 317 (1979), we stated that, "[s]ince eyewitness identification often plays a major, if not a determinative, role in the trial of criminal offenses, and the dangers of mistaken identification are great and the result possibly tragic, defendants must be allowed to examine fully during the voir dire hearing the *totality* of circumstances . . . " (emphasis in original). Such a full examination was allowed in the pres-

---

[2] "My observations of Mr. Fischman at the hearing reveal him to be a very careful and deliberate person who chooses words with great care and who responds as to his observations with candor and precision. Brief as it was, he had an opportunity to view the person leaving the bank and came away with certain general impressions as to facial profile and movement characteristics which manifested themselves again at the lineup. The photographic displays made no general impression on him, and I find his identification was made solely through the lineup, which was conducted fairly. The subsequent conversations with the District Attorney were not calculated to strengthen the identification and did not strengthen it. The fact that the identification is only in terms of 'resembling' the person goes to weight not admissibility."

ent case. The judge made careful and detailed findings of fact based on the six days of testimony at the hearing on the motions to suppress. During the hearing defense counsel was allowed great latitude in questioning the witnesses concerning the circumstances of their identifications. The judge, after carefully summarizing the evidence, arrived at the conclusions that the Mark and Fischman identifications were admissible, but that the testimony of a third person, not an eyewitness, should be excluded. The judge's findings and conclusions take up thirty-eight pages, plus two pages of footnotes, and are an outstanding example of thoroughness. We shall accept his findings of fact as binding in the absence of clear error, see *Commonwealth* v. *Moon,* 380 Mass. 751, 755-756 (1980), and view with particular respect the conclusions of law which are based on them. See *Commonwealth* v. *Cincotta,* 379 Mass. 391, 392 (1979). We shall not go behind the facts found by the judge on the motion except to the extent that it is alleged that the evidence was not sufficient to support the findings made. As to evidence which was introduced at the hearing, whether or not contradicted, concerning which the judge made no findings, we have no way to tell whether, or to what extent, he believed it to be true. We shall therefore consider such evidence only where it is alleged that a failure to make findings with respect to that evidence was clearly erroneous. The defendant here does not make such a claim, but challenges the legal standards applied and conclusions reached by the motion judge.

With respect to the ultimate conclusions of law reached by the judge, we shall undertake an independent examination of the facts found by the judge to ascertain whether they involve a deprivation of the defendant's constitutional rights. *Commonwealth* v. *Moon, supra* at 756.

The defendant argues that the lineup identifications by Mark and Fischman were the product of impermissibly suggestive police procedures which gave rise to a very substantial likelihood of mistaken identification. The specific suggestive procedures alleged regarding the Mark identification

are (1) the impact of the repeated showing, seven times within one week, of the defendant's picture to the witness, where three of the pictures were shown as part of an array found to be unnecessarily suggestive; (2) the comment made by the detective who showed the first set of pictures to Mark; (3) the "numerous features" of the lineup which focused the witness's attention on the defendant, including (a) the use of a wig dissimilar to the one used in the robbery but similar to one worn by the defendant in one of the mug shot pictures, (b) the fact that the defendant was the only one in his lineup whom the witness had seen before in photographs, (c) the fact that the defendant had the lightest hair of anyone in his lineup, (d) the fact that the defendant was required to repeat certain phrases and exercises, which some other lineup standees were not required to do, and (e) conducting the lineups before witnesses to a number of crimes for which the defendant was suspected, and telling the witnesses that two suspects would be present at the lineups.

The suggestive procedures alleged with respect to the Fischman identification are the same as the above, with the exceptions that he was shown pictures of the defendant three times during the week after the robbery attempt, not seven, and was not shown the suggestive array prepared by the bank security officer, and with the addition that to show Fischman a lineup of only males may be considered suggestive because he originally had expressed some doubt whether the person he saw was male or female.

The suggestive procedures, it is argued, even more compellingly require the suppression of the identifications when considered in light of the relatively brief glimpse which each witness had of the vaulter, and the extremely long time, some sixteen months, which elapsed between the time of the crime and the lineup at which the witnesses identified the defendant for the first time.

III.  *The Legal Standard.*

The defendant had the burden of proving by a preponderance of the evidence that the procedures employed in the showing of the photographic arrays and in the lineup were

so unnecessarily suggestive and conducive to mistaken identification as to deny the defendant due process of law. *Stovall* v. *Denno,* 388 U.S. 293, 301-302 (1965). *Commonwealth* v. *Venios,* 378 Mass. 24, 26-27 (1979). Such a showing must depend on the totality of the circumstances of the confrontation alleged to be impermissibly suggestive. Should such a showing be made, the burden then on the Commonwealth, if it wishes to use evidence of the identification at trial, is that "of establishing by 'clear and convincing evidence' that the proffered identification has a source independent of the suggestive confrontation." *Commonwealth* v. *Botelho,* 369 Mass. 860, 865-868 (1976). *Venois, supra.*

In this case the judge made detailed findings, based on the evidence which was before him, that the lineup and the photographic array confrontations were conducted fairly and in a nonsuggestive manner. He found that there was some suggestiveness attached to the showing of the photographic array prepared by the bank security officer, and to the post-lineup interviews between the Commonwealth and the witnesses. He further indicated that he was aware of the possibility of a cumulative effect on the witnesses from the showings of the same photographs of the defendant at different times during the week after the crime. He then explicitly found that the identifications by Mark and Fischman were based upon their opportunity to observe the "vaulter" at the time of the crime, and that these identifications were not influenced either by the showing of the photographs, the conduct of the lineup, or the interviews which occurred thereafter. In effect, he found that the Commonwealth had proved by "clear and convincing evidence" that the identifications had a basis independent from any suggestive police procedures.

We hold that the judge ruled correctly that the identifications of the defendant by Mark and Fischman were properly admissible. Whether a particular pretrial photographic identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable mis-

identification must depend on an evaluation of the totality of the circumstances. *Simmons* v. *United States*, 390 U.S. 377 (1968). Here, as in *Simmons* (*id.* at 384) it was necessary that the police resort to photographic identification by eyewitnesses as part of their investigation of a serious felony. Here, unlike in *Simmons*, the opportunity for the witnesses to view the perpetrator was fairly short, and the perpetrators were disguised. Mark and Fischman were shown arrays of photographs by the police and F.B.I. in circumstances which the judge found were not suggestive. Although the defendant's picture was included in several of these arrays, Mark and Fischman made no identification of the defendant from the arrays. Cf. *Commonwealth* v. *Napolitano*, 378 Mass. 599, 601 (1979). The judge found that their failure to identify the defendant's photograph was because his appearance was substantially different at the time the pictures were taken from the time of the lineup at which both witnesses identified the defendant. In addition, the features of the defendant which were best perceived and remembered by the witnesses, and which were in large part the basis for their identification of the defendant at the lineup, i.e., the shape of his body, the size of his chest and shoulders, the length of his arms in relation to his height, his jumping style, were not ascertainable from the photographs shown the witnesses.

Notwithstanding extended and vigorous cross-examination of the witness by able and experienced trial counsel for the defendant, Mark and Fischman held fast to their identifications, albeit, in the case of Fischman, with some reservations and qualifications which he held to from the beginning. See *Commonwealth* v. *Clark*, 378 Mass. 392, 398, 402 (1979). These reservations, like those of the witness in *United States* v. *Eatherton*, 519 F.2d 603, 609 (1st Cir.), cert. denied, 423 U.S. 987 (1975), themselves indicate that "the police conduct was without significant effect." They were properly presented to the jury by defense counsel on cross-examination of the witness, for their consideration in weighing the value of Fischman's testimony. Thus, as in

*Simmons*, although the procedures, particularly the array shown Mark by the security office, used to elicit the identifications "may have in some respects fallen short of the ideal," *Simmons, supra* at 385-386, we hold that the identifications, considered in the totality of the circumstances, were not unnecessarily suggestive so as to require their suppression as a matter of due process of law. See *Commonwealth* v. *Venios*, 378 Mass. 24, 29 (1979).

In *Foster* v. *California*, 394 U.S. 440 (1969), the accused was (a) by far the tallest of three persons in an initial lineup, (b) the only one there dressed similarly to the robber, (c) was subjected after the lineup to a one-on-one confrontation with the witness, and (d) was later subjected to a second lineup in which he was the only person who had appeared in the first lineup. After all of this, the witness for the first time positively identified the defendant as the robber. The United States Supreme Court held there that the suggestive identification procedure so undermined the reliability of the eyewitness identification as to violate due process in that it made it "all but inevitable" that the witness would identify the defendant. *Id.* at 443. In the present case the lineup was conducted without any suggestive procedures, except such as were occasioned by the defendant's own actions in failing at first to speak the required words loud enough to be heard, and of which he cannot complain. See *Wilson* v. *State*, 237 Ga. 657 (1976). There was no claim that the witnesses' identifications in any way influenced one another. Cf. *Commonwealth* v. *Cincotta*, 379 Mass. 391 (1979); *United States* v. *Rodriguez*, 363 F. Supp. 499 (D.P.R. 1973), aff'd sub nom. *United States* v. *Lespier*, 558 F.2d 624 (1st Cir. 1977). The defendant was not the only person viewed at the lineup whose pictures the witnesses had seen before; Ulatowski's picture had also been shown numerous times to the witnesses, but he was not identified at the lineup, although Fischman had initially indicated that his picture "resembled" the vaulter. See *Simmons* v. *United States*, 390 U.S. 377, 385 (1968). Moreover, the lineup was the first time the witnesses had viewed the

defendant in person, and were able to compare crucial physical aspects of the defendant with those they recalled of the "vaulter."

The only aspect of the identification found to be suggestive by the motion judge was the array shown Mark by the bank security officer. Far from making it "all but inevitable" that Mark would identify the defendant whether or not he was in fact "the man," *Foster* v. *California, supra,* the suggestive elements of that array, even when combined with the cumulative effect, if any, of the repeated nonsuggestive showings of the defendant's photograph, were virtually irrelevant to the identifications of the defendant by the witnesses. Indeed, we note that at trial, after Mark reiterated her lineup and in-court identifications of the defendant, she stated in essence that she still would not be able to identify the defendant from the photographs she had viewed.

In light of our decision to affirm the ruling of the judge that the Mark and Fischman identifications were based independently from any suggestive police procedures, we need not consider whether the less strict standard of "reliability" set by *Manson* v. *Brathwaite,* 432 U.S. 98 (1977), has been met. *Commonwealth* v. *Storey,* 378 Mass. 312, 319 & n.9 (1979). We have not yet squarely confronted the application of this test to unnecessarily suggestive police procedures. See *Commonwealth* v. *Moon,* 380 Mass. 751, 759 (1980); *Commonwealth* v. *Cincotta,* 379 Mass. 391, 396-397 (1979); *Commonwealth* v. *Rodriquez,* 378 Mass. 296, 305-306 (1979); *Commonwealth* v. *Venios,* 378 Mass. 24, 27-28 (1979); *Commonwealth* v. *Jackson,* 377 Mass. 319, 331 n.11 (1979); *Commonwealth* v. *Marini,* 375 Mass. 510, 519 (1978).

IV. *Jury Instruction on Attempted Armed Robbery.*

In his charge to the jury the trial judge gave a correct and detailed instruction on the elements of the crime of murder. The judge stated that the only type of murder in the first degree which was raised by the evidence was felony murder, which is murder "committed in the commission or at-

tempted commission of a crime punishable with death or imprisonment for life." G. L. c. 265, § 1. The judge correctly instructed the jury on the elements of armed robbery, and then instructed them concerning an "attempt" as is reprinted below.[3] After the charge, defense counsel raised a question about the adequacy of the latter instruction, but did not object or take an exception to this aspect of the charge. This point was not included in the defendant's assignments of error. Therefore the question of the sufficiency of this instruction is not properly before us except under G. L. c. 278, § 33E. *Commonwealth* v. *McDuffee*, 379 Mass. 353, 357 (1979).

The defendant asks that we undertake review on this point under § 33E, and reverse the conviction on the ground that the instruction on attempt was so inadequate as to give rise to a substantial risk of a miscarriage of justice. We find no such risk here.

The practice of instructing a jury by use of reference to the testimony in evidence in the case, which was employed by the judge here, has long been used in this Commonwealth. While it is preferable that the jury be instructed with particularity on the elements of the offense charged, ordinarily where the testimony of the witnesses is unanimous concerning what transpired, and where these facts, if believed by the jury, would clearly constitute the crime charged in all its legal elements, such a "shorthand" method of instruction would not amount to a lessening of the Com-

---

[3] "Now remember that the statute talks about the commission or attempted commission of a crime punishable with life imprisonment, and attempt involves more than just preparation to do something criminal. And in order to have an attempt you must have certain acts which must come somewhere near the accomplishment of the crime.

"Now on the evidence in this case you would be justified in finding, it is up to you what you find the facts to be of course, that the crime of armed robbery was not committed because nothing was taken away from the bank, but should you accept the testimony of the various witnesses you would also be warranted in finding there was an attempted commission of an armed robbery at the Sears Crescent Branch of the First National Bank."

monwealth's burden to prove all of those elements beyond a reasonable doubt.

Where intent is a necessary element of the crime charged, and there is no direct evidence of the defendant's intent at the time of the crime, the jury are permitted, but not required, to infer the element of criminal intent from the circumstances. An instruction which states merely that, if the jurors believe the evidence concerning the objective events of the crime, they would be warranted in finding that the crime has occurred, may be deficient in failing to instruct the jury that the Commonwealth must prove the element of intent beyond a reasonable doubt. Such an instruction may in effect transform a permissible inference of intent into a mandatory presumption arising from proof of certain underlying facts and circumstances, and, thus, run afoul of the constitutional requirement of *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975), and its progeny, that the Commonwealth must prove all necessary elements of a crime beyond a reasonable doubt.

The defendant argues that the present charge did not require the jury to find that the defendant intended to commit the crime of armed robbery at the time of the alleged attempt, and that therefore it was left open to the jury to convict the defendant in the absence of proof beyond a reasonable doubt of this necessary element. We do not agree. The judge stated in his charge that, since the Commonwealth's theory was that Correia did not fire the shot but "was an active participant in a joint venture involved in an attempted armed robbery," the jury must determine whether Correia was "actively engaged in, participating with another person in the commission or attempted commission of an armed robbery." The instruction continued as appears in the margin below.[4] The judge emphasized that

---

[4] "So the first question . . . you must determine, was Mr. Correia, if you find he was there, actively engaged in, participating with another person in the commission or attempted commission of an armed robbery as the Commonwealth contends.

"Now mere knowledge that a crime is to take place, mere presence even at the commission of a crime, mere failure to stop somebody else from

"mere presence" at the commission of a crime was not enough to find the defendant responsible for commission of the killing, but that the jury must find "complicity" and "active involvement" of Correia in the attempted armed robbery, in the course of which a killing occurred, in order to find him responsible for the murder.

This instruction clearly had the effect of putting before the jury the defendant's level of voluntary and active participation in the armed robbery attempt at the time the guard was killed as a necessary element of the crime charged. Since this element clearly encompasses the defendant's intent to commit an armed robbery at the time of the attempt to rob and the shooting, there was no error on this ground when the charge is taken as a whole. *Commonwealth* v. *Medina*, 380 Mass. 565, 577-578 (1980), and cases cited.

---

committing a crime, that isn't enough to make somebody equally responsible with the person committing the crime. There has to be more than just guilt by association. But if one intentionally encourages or actively assists or participates in the commission or attempted commission of a crime such as armed robbery, having the intention to commit armed robbery, then that person is a joint venturer, an accomplice in a criminal enterprise such as armed robbery which is a felony.

"Should you determine, it is up to you what you determine, should you determine that Mr. Correia was a joint venturer, a joint participant with somebody else in a felony, an armed robbery or an attempt to commit an armed robbery, and should you find that a homicide occurred, a killing occurred in the commission or attempted commission of that felony, that armed robbery, then Mr. Correia's complicity in that felony, his active involvement in that felony, if you find he was actively involved, that would be sufficient, I instruct you, Mr. Foreman and members of the jury, to establish his guilt for the homicide, for the murder in the first degree. If the homicide, the killing followed naturally and probably from the carrying out of the joint enterprise, even though it was not Mr. Correia who pulled the trigger . . . it makes no difference that the killing, murder if you so find, was not contemplated by either the person doing the shooting or by Mr. Correia, if you find Mr. Correia was involved. . . . If you find he actively participated in an attempted armed robbery, then Mr. Correia is guilty of murder, if a murder took place in the commission of that armed robbery, he is as guilty as the person who actually pulled the trigger."

V.  *Section 33E Review.*

We have reviewed the entire record and transcript of the trial, including the remainder of the charge to the jury, and find no ground for granting relief pursuant to our power under G. L. c. 278, § 33E.

*Judgment affirmed.*