COMMONWEALTH *vs.* MARCO WILLIS.

Suffolk. April 5, 1993. - July 15, 1993.

Present: LIACOS. C J.. WILKINS. LYNCH. O'CONNOR. & GREANEY. JJ.

*Threshold Police Inquiry. Arrest.*

In the circumstances, police officers had a reasonable suspicion, based on specific articulable facts, that a certain person (defendant) was carrying a stolen gun that might be loaded, on the basis of a police teletype communication from Michigan describing the defendant (who was known to the Boston police), predicting the defendant's arrival at a certain time on a bus, describing what the defendant would be carrying, and stating that the defendant would be armed with a thirty-eight caliber handgun and ammunition, where the detailed descriptive information in the teletype message was corroborated by observations of the police officers; therefore an investigative stop of the defendant after he alighted from the bus was warranted. [814-819] LIACOS, C.J., dissenting.

Where police officers were justified in conducting a threshold inquiry of a certain person, who was suspected of being armed, the force used by the officers in effecting the stop was appropriate to the circumstances, and. did not render the encounter an arrest. [819-821] LIACOS, C.J., dissenting.

COMPLAINT received and sworn to in the Boston Municipal Court Department on January 6, 1992.

A pretrial motion to suppress evidence was heard by *Isaac Borenstein*, J.

An application for an interlocutory appeal was allowed by *Wilkins*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Kenneth H. Anderson*, Assistant District Attorney, for the Commonwealth.

*Benjamin H. Keehn*, Committee for Public Counsel Services, for the defendant.

WILKINS, J. We once again consider the highly fact-based questions whether, in particular circumstances, (1) a police stop of a defendant was an arrest or merely a threshold inquiry and (2), if it was a threshold inquiry, whether there was a sufficient factual basis for conducting that preliminary inquiry.[1] A judge sitting in the Boston Municipal Court ruled that the police arrested the defendant and that they lacked probable cause to do so. He also concluded that, even if the police had not arrested the defendant, but had only detained him temporarily, the police had no justified reasonable suspicion to detain him. The motion judge, therefore, allowed the defendant's motion to suppress a gun and ammunition that the police had seized from the defendant, as well as statements the defendant had made to the police.

A single justice of this court allowed the Commonwealth's request for an interlocutory appeal and ordered that the appeal be entered in this court. We acknowledge that the issues are close, but we conclude that the police were only conducting a preliminary inquiry and that they had a proper basis for doing so. Thus the order allowing the defendant's motion to suppress should be vacated, and an order denying that motion should be entered.

Just before 3 P.M. on January 5, 1992, the Flint, Michigan, police department sent a teletype communication to the Boston police department. The substance of the communication was that Marco Willis, a black male, five feet ten inches tall, with short hair, last seen wearing a blue jean jacket and pants and black tennis shoes, should be on a Greyhound bus arriving in Boston at approximately 6:50 P.M. He should be carrying a blue and white pillowcase with stripes and no other luggage. Willis was said to be armed with a thirty-eight caliber handgun, taken from his grandfather's house, along with five live rounds. The communication purported to give the gun's serial number and the name of the person to whom the gun was registered. It asked that, if Willis were

---

[1] Another often related fact-based question, whether there was probable cause to arrest (if there was an arrest), is not involved in this appeal.

apprehended, the weapon be confiscated and the Flint police advised.

At 4 P.M. that day, Sergeant Richard Famolare of the Boston police department telephoned the Flint police department to verify the information. The officer who had sent the teletype message had gone home for the day. Famolare obtained no further information from Flint. At roll call that afternoon, Famolare learned that Officer William Reynolds had arrested Willis in 1991 for armed robbery.[2]

Famolare, Reynolds, and two other officers went to the Greyhound bus terminal in plain clothes but with their badges visible. When Willis got off the bus carrying a striped pillowcase, Famolare and two officers, with their guns drawn, followed Willis. Reynolds went through the bus terminal and confronted Willis from the opposite direction in a driveway down which Willis was walking. No other people were in the driveway. Reynolds, with his gun out and his badge visible, called, "Marco, police, take your hand out of your right pocket." Willis looked at Reynolds and then looked back at the other officers. He removed his hand from his pocket and raised his hands. One of the officers pushed Willis's arms all the way up above his head, and Famolare removed a gun from Willis's pants. Willis volunteered that he had taken the gun for his own protection.

We state a fact as to which there was testimony but on which the motion judge made no specific finding. Famolare testified that "[w]e had expected the suspect to have a loaded firearm on him," and that that was the reason that he had his gun outside its holster. The judge seems to have overlooked this testimony when he stated in his analysis that "[t]he officers did not testify that they feared for their safety." While it is true that the two officers who were wit-

---

[2]Although the judge's findings do not spell out the details of Reynolds's acquaintance with Willis, Reynolds's testimony, which the judge credited in other aspects, was that Reynolds had arrested Willis twice on outstanding default warrants and once for armed robbery and assault and battery with a dangerous weapon, a knife. The armed robbery charge had been dismissed in July, 1991, for failure of the victim to come to court.

nesses, Famolare and Reynolds, did not both so testify, Famolare's testimony indicated that he had been concerned for his safety.[3] Famolare and Reynolds were the only witnesses. The motion judge did not discredit their testimony, and we do not usurp his function in supplementing his findings in this respect.

In the circumstances, we are entitled to conclude and do conclude that the officers drew their weapons because they were concerned for their safety. We further conclude that their concern was reasonable. The fact that the officers were reasonably concerned for their safety is crucial in our subsequent analysis of the question whether the police arrested Willis, or only made a threshold inquiry of him. If the police arrested Willis, the physical evidence seized from Willis and his statements should have been suppressed because the Commonwealth rightly concedes that the police did not have probable cause justifying an arrest. If, however, the police were conducting a threshold inquiry, we must consider whether the police had a reasonable suspicion, based on specific, articulable facts and reasonable inferences, that the defendant had committed, was committing, or was about to commit a crime. See *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990); *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984). See also *Terry* v. *Ohio*, 392 U.S. 1, 20-22 (1968).[4]

1. We first consider whether there was a reasonable suspicion, based on specific articulable facts, that the defendant

---

[3]The prosecution could perhaps have developed this issue more fully. Not only could Reynolds also have been questioned on the point, but Famolare's and Reynolds's reasons for safety concerns might have been developed. Not only was there some basis for believing that Willis had a loaded gun, but there was also a reasonable basis for concluding that Willis had once committed a crime of violence with a dangerous weapon. There may also have been a basis for concern for public safety in the vicinity of a bus terminal.

[4]It seems clear that, after the police accosted Willis, he was not free to leave. Therefore, under both art. 14 of the Constitution of the Commonwealth (*Commonwealth* v. *Borges*, 395 Mass. 788, 791 [1985]) and the Fourth Amendment to the Constitution of the United States (*California* v. *Hodari D.*, 499 U.S. 621 [1991]), there was a "seizure" implicating constitutional protections against unreasonable seizures.

had committed or was committing a crime. See *Common-wealth* v. *Wren, supra.* If so, a *Terry*-type investigative stop would be justified. See *Commonwealth* v. *Owens,* 414 Mass. 595, 599 (1993), and cases cited. We turn to this question first because, if there was not even a reasonable suspicion justifying a *Terry*-type police stop, there would be no need to decide whether the seizure of the defendant was an arrest, which would have had to have been based on probable cause, or just an investigative stop. Moreover, we deal with this issue first because, if reasonable suspicion justified stopping the defendant for a preliminary inquiry, the strength and nature of that suspicion has a bearing, as we shall explain, on the question whether the police intrusion on the defendant was an arrest or simply a stop for a preliminary inquiry. See *Commonwealth* v. *Borges,* 395 Mass. 788, 794 (1985); *Commonwealth* v. *Bottari,* 395 Mass. 777, 782 (1985).

The teletype communication from Michigan appears to be based on information furnished by an undisclosed informant. "[I]f the police conduct an investigatory stop based on an informant's tip, our evaluation of the tip's indicia of reliability will be focused on the informant's reliability and his or her basis of knowledge. Independent police corroboration may make up for deficiencies in one or both of these factors. Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing in each of these areas is permissible." *Commonwealth* v. *Lyons, supra* at 19. When the police rely on a transmitted message to conduct an investigatory stop, the Commonwealth must establish its indicia of reliability, both the reliability of the informant and the basis of the informant's knowledge. *Commonwealth* v. *Cheek,* 413 Mass. 492, 494-495 (1992), and cases cited.

We disagree with the motion judge's conclusion that the informant's basis of knowledge concerning the defendant's conduct was not established in this case. The teletype message itself goes a long way toward showing the informant's basis of knowledge by providing detail concerning the pillowcase, the serial number of the gun, the name of the registered owner, and the fact that the gun was taken from the house of

the defendant's grandfather. When the defendant, known to the Boston police, got off the bus, as predicted in the teletype message, carrying a distinctively striped pillowcase, the information sent from Michigan was significantly corroborated, particularly, and rather conclusively, as to the soundness of the informant's basis of knowledge. See *Commonwealth* v. *Bakoian*, 412 Mass. 295, 301-302 (1992). Compare *Draper* v. *United States*, 358 U.S. 307, 313 (1959). Moreover, while we agree with the motion judge that the teletype message tells us nothing about the credibility of the informant or about the reliability of the information, the corroboration of portions of the teletype information by the police who met the bus makes a sufficient but "less rigorous showing" (see *Commonwealth* v. *Lyons, supra*) that the information was reliable and thus warranted a reasonable suspicion that the defendant was carrying a stolen gun which might be loaded.

Although each case depends on its facts, this case is more like *Commonwealth* v. *Anderson*, 366 Mass. 394, 399-400 (1974), in which an anonymous tip about a bus passenger was sufficiently corroborated to justify a threshold inquiry, than it is like *Commonwealth* v. *Lyons, supra* at 20-21, in which a tip, lacking the basis both of an informant's knowledge and of his reliability and not corroborated by significant specific facts concerning the suspect, did not justify a threshold inquiry. We agree, however, that the Commonwealth has properly declined to assert that there was probable cause to arrest the defendant. See *Commonwealth* v. *Spence*, 403 Mass. 179, 181-182 (1988).

2. In deciding whether this encounter was an arrest or "merely" a stop, we do not apply a bright line test. The answer depends on the proportional relationship of the degree of intrusiveness on the defendant to the degree of suspicion that prompted the intrusion. *Commonwealth* v. *Borges, supra* at 794. We should consider "the degree to which the defendant's movement is restrained, the degree of force used by the police, and the extent of the intrusion." *Commonwealth* v. *Sanderson*, 398 Mass. 761, 766 (1986). See *Commonwealth* v. *Bottari, supra* at 781; *Commonwealth* v. *An-*

*drews*, 34 Mass. App. Ct. 324, 328-329 (1993). Specific factors include the length of the encounter (*Commonwealth v. Sanderson, supra*; *Commonwealth v. Modica*, 24 Mass. App. Ct. 334, 339 [1987]), the nature of the inquiry (*id.*), the possibility of flight (*Commonwealth v. Moses*, 408 Mass. 136, 141 [1990]; *Commonwealth v. Blake*, 23 Mass. App. Ct. 456, 460 [1987]), and, most important, the danger to the safety of the officers or the public or both (*Commonwealth v. Moses, supra* at 141-142; *Commonwealth v. Bottari, supra* at 782).

The extent of the danger is important in assessing whether the force used by the police in the encounter was commensurate with their suspicion. The police are, of course, entitled to take reasonable precautions for their protection. See *Commonwealth v. Owens*, 414 Mass. 595, 600 (1993); *Commonwealth v. Johnson*, 413 Mass. 598, 600 (1992); *Commonwealth v. Robbins*, 407 Mass. 147, 151-152 (1990) (police officers are "not required to gamble with their personal safety"). The crucial safety question is the extent of the danger at the time the police used force. *Commonwealth v. Bottari, supra* at 782. The suspicion that the person encountered has an illegal gun may not of itself justify the use of force absent "other fear-provoking circumstances." *Id.*

In this case, the officers used force to stop the defendant. They outnumbered the defendant, and approached him with their guns drawn (but not pointed at him). See *Commonwealth v. Sanderson, supra*; *Commonwealth v. Bottari, supra*. The defendant claims that this stop was akin to that in *Commonwealth v. Bottari*, in which we held that the officers' use of force in approaching a blocked motor vehicle with their guns drawn was an arrest, and not a stop, because there was no evidence that the officers feared for their safety or that of others. See *id.* The case before us involves a concern for safety that the *Bottari* case lacked. Moreover, the degree of suspicion here is justifiably greater than in the *Bottari* case where the tip about possession of a gun was far less specific and did not explicitly indicate, as here, either that

the defendant was carrying the gun or that the gun might be loaded. See *id.* at 778.

We conclude that the intrusion was a stop, and not an arrest. The seizure of the gun was within the range of proper conduct in the course of this stop. Constitutional principles do not require the police to approach a person who is reasonably suspected of being armed with a loaded, stolen handgun and reasonably believed to have engaged in violent criminal conduct without taking precautions against the use of that weapon against them. What police knew about the defendant's propensity toward unlawful conduct is not an inappropriate consideration in deciding this issue. The police were not required to ignore the teletype message. When the defendant got off the bus carrying the striped pillowcase, the police were justified in approaching the defendant, and, in the circumstances, a threshold inquiry with weapons drawn was warranted.

The order allowing the motion to suppress is vacated. An order shall be entered in the Boston Municipal Court denying the motion to suppress.

*So ordered.*

LIACOS, C.J. (dissenting). In *Commonwealth* v. *Moon*, 380 Mass. 751, 755-756 (1980), this court stated a fundamental principle of appellate review of rulings by a trial judge on a motion to suppress. That standard is: "The evidence before the judge at the hearing on the motions to suppress consisted entirely of oral testimony. The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court. In such a situation, where subsidiary findings of fact have been made by the trial judge, they will be accepted by this court, and we do not substitute our judgment for his, absent clear error." Further, we have stated in *Commonwealth* v. *Bottari*, 395 Mass. 777 (1985): "We begin our review with the well-settled proposition that the judge's find-

ings of fact are 'binding in the absence of clear error . . . and [we] view with particular respect the conclusions of law which are based on them.' *Commonwealth* v. *Correia*, 381 Mass. 65, 76 (1980). While the judge's ultimate findings of fact and rulings of law, as they bear on issues of constitutional dimension, are open for reexamination by this court, such ultimate findings are 'entitled to substantial deference by this court.' *Commonwealth* v. *Bookman*, 386 Mass. 657, 661 n.6 (1982). Questions of credibility are, of course, for the trial judge to resolve. *Commonwealth* v. *Meehan*, 377 Mass. 552, 557 (1979)." *Bottari, supra* at 780.

Nowhere in its opinion does the court make reference to these well-settled principles of appellate review. The motion judge in this case took the time, as he should, to make extensive written findings of fact which the Commonwealth does not contend to be unwarranted by the extensive oral evidence. Additionally, the motion judge wrote at length on the relevant legal principles and reached, in my view, appropriate conclusions of law in ordering the evidence suppressed. Thus, I am troubled by the court's disregard for the findings of the judge and its willingness to "supplement" critical findings with contrary conclusions. The court concludes that the encounter at issue was an investigatory stop and not an arrest. I must dissent because I believe the judge correctly ruled that the encounter was an arrest without probable cause. I perceive no reasoned basis for ignoring the motion judge's findings and conclusions in this regard. See *Bottari, supra* at 780.

For four hours, the Boston police did nothing to verify the teletype implicating Willis beyond placing one fruitless phone call to Michigan. Another call or two might well have yielded information sufficient to support a search warrant, for which there was plenty of time to apply. When Willis's bus arrived, he walked calmly and at a normal pace away from the bus terminal. Surrounded in an alleyway by four police officers with their guns drawn, and ordered to stop, Willis complied. Willis raised his arms overhead; an officer forcibly raised them higher. The force used to restrain and

search Willis was similar to the force used by the officers in *Bottari, supra,* where we held that the encounter constituted an arrest. In one significant respect, the force used here was greater: unlike *Bottari,* where two officers confronted four people, the officers here outnumbered the defendant four to one. See *Commonwealth* v. *Sanderson,* 398 Mass. 761, 766-767 (1986).[1]

The court bases its conclusion that this encounter was an investigatory stop and not an arrest, and thus distinguishable from *Bottari,* on the fact that the officers in this case feared for their safety. See *ante* at 820. The court bases this conclusion on the testimony of one of the officers that he had his gun drawn because "[w]e had expected the suspect to have a loaded firearm on him." Thus, the court feels "entitled to conclude . . . that the officers drew their weapons because they were concerned for their safety . . . [and] that their concern was reasonable." *Ante* at 817.[2] Even if the court's view is correct, we have held that "the fact that the officers suspected that one of the occupants may have had an illegal gun does not justify their use of force, without the presence of other fear-provoking circumstances . . . ." *Bottari, supra* at 782. *Bottari* thus states a clear principle: fear-provoking circumstances *other than suspecting that the defendant might*

---

[1]The court attempts to justify this use of force by stating that the degree of suspicion in this case was greater than in *Bottari,* because here, the tip was more specific and indicated that the suspect was carrying the firearm and live ammunition (contrary to the court's assertion, the teletype did not indicate that the gun was loaded with the ammunition). While the law of search and seizure often requires line-drawing, the court today engages in hair-splitting: concern that a subject might be armed and dangerous would not seem more likely to arise from a tip that "There's a Joseph Bottari who has a big gun and it looks like a Magnum and he's got no license, and he's at the Assembly Mall" see *Bottari, supra* at 778, than an unconfirmed teletype stating that a man with a stolen gun and five rounds of ammunition would be getting off a bus from Michigan. Surely any reasonable officer would approach either subject with an equal degree of caution.

[2]The judge's findings of fact on this point are to the contrary. "In fact, the officers did not even testify that they feared for their safety or for the safety of the public."

*possess a firearm* are necessary to justify a search of the type executed on Bottari and on Willis.[3]

What were the fear-provoking circumstances present here? Apart from the "concern for safety," that the court extracts from the officers' suspicion that Willis had a gun (which is insufficient under *Bottari*), there are none. By all accounts, and as the judge below found: "The officers' use of force was not precipitated here by any suspicious action by the defendant. There was no evidence or testimony at the hearing on the motion to suppress indicating that the defendant's actions [led] to the officers' fear for their safety or for the safety of the public. Upon Mr. Willis' arrival at the Greyhound bus station, he walked out of the bus and began to leave the station area: his stride was normal, his head was down and he was alone." I see no reason to disturb the judge's conclusion that no fear-provoking circumstances justified the intrusion on Willis's liberty.

The court's fact-finding takes an even more dangerous turn when it considers Officer Reynolds's acquaintance with Willis. Relying on Reynolds's testimony, given at the suppression hearing and briefly mentioned in the judge's decision, the court "supplements" the judge's findings with the detail that Reynolds had arrested Willis twice on outstanding default warrants and once for armed robbery and assault and battery with a dangerous weapon, a knife. *Ante* at 816. As the court

---

[3]The court apparently relies on the fact that in this case there was testimony that the officers suspected the defendant possessed a gun, but that, in *Bottari*, there was no such explicit testimony. The fact that no testimony to this effect was presented in *Bottari* is of no moment, since *Bottari* clearly requires evidence of "fear-provoking circumstances" other than a suspicion that the defendant has a firearm.

Although the motion judge could have been clearer in his analysis, I do not agree with the court that he "overlook[ed]" the officer's testimony regarding the suspicion that Willis had a firearm. Ante at 816. On the contrary, the judge recognized this testimony when he stated: "[E]ven where police corroborate information supplied to them by an informant concerning allegations of illegal possession of a firearm, 'the fact that the officers suspected that one of the [defendants] may have had an illegal gun does not justify their use of force, without the presence of other fear-provoking circumstances . . .'" (quoting *Bottari, supra* at 782).

notes, the armed robbery charge had been dismissed well before the encounter at issue. The court nonetheless bolsters its conclusion that the intrusion was justified as a stop and not an arrest by stating that the officers "reasonably believed [Willis had] engaged in violent criminal conduct." Such conjecture is utterly inappropriate, and sends a frightening message that once a person has been accused of any violent conduct, even when it is completely unproven, he shall forevermore be susceptible to intrusive police action. I note my vigorous disagreement with any such suggestion.

I believe that the judge correctly concluded that encounter constituted an arrest. I agree with the court, the motion judge, and the Commonwealth that there was no probable cause to support an arrest. I would affirm the decision of the motion judge.