COMMONWEALTH vs. DAVID E. GIACALONE
(and eleven companion cases[1]).

Suffolk. January 8, 1987. — May 14, 1987.

Present: ARMSTRONG, CUTTER, & FINE, JJ.

*Identification. Rape. Practice, Criminal,* In camera inspection, Psychiatric examination, Instructions to jury, Disclosure of evidence. *Witness,* Psychiatric examination. *Evidence,* Privileged communication, Hearsay.

At a pretrial hearing where defendants charged with rape sought an in camera inspection of the victim's psychiatric and mental health records, the judge correctly ruled, after observing the victim testify, that the defendants had not made a sufficient preliminary showing of legitimate need for access to the privileged materials. [170-171]

At a criminal trial, no error appeared in the judge's instructions on reasonable doubt and burden of proof. [171]

Where evidence of discrepancies in a rape victim's descriptions of the height of one of her assailants was before the jury and argued to them, no prejudice resulted from the prosecution's failure to produce before trial a police report documenting the same variation in description. [172]

At a rape trial where the principal issue was the identification of the defendants as the assailants and the prosecution's identification testimony was strong and convincing, there was no reversible error in the admission of hearsay evidence concerning the location and condition of the victim's car when found, where those facts were not in question and were of little relevance. [172-174]

INDICTMENTS found and returned in the Superior Court Department on February 13, 1984.

Pretrial motions were heard by *Elizabeth A. Porada, J.,* and the cases were tried before *George N. Hurd, Jr., J.*

*John F. Palmer* for Michael Quarto.

*Steven J. Rappaport* for David E. Giacalone.

*Marcy Cass,* Assistant District Attorney, for the Commonwealth.

---

[1] Five of the companion cases are against Giacalone and six are against Michael Quarto.

CUTTER, J. These are appeals by Giacalone and Quarto from convictions on indictments charging each defendant with one count of (1) assault with intent to murder, (2) aggravated rape, (3) kidnapping, and (4) armed robbery, and with two counts of assault and battery by means of a dangerous weapon. After trial beginning March 19, 1985, before a Superior Court judge and a jury, verdicts of guilty were returned against each defendant on each indictment. Sentences of forty to sixty years at M.C.I., Cedar Junction, were imposed on each of the aggravated rape and armed robbery indictments. Terms of seven to ten years were imposed on each other indictment.[2] All sentences were to run concurrently. Appeals to this court were seasonably claimed.

The victim testified as the prosecution's first witness. Principally on her testimony, the jury could have found the following facts.

On December 3, 1983, she attended a concert in Boston at the Orpheum Theatre. She left her automobile about 9 P.M. near the North Station under the expressway and went to the theatre by public transportation. She left the concert between 12:30 A.M. and 1 A.M. and started to walk to her automobile.

Because of lack of familiarity with downtown Boston at night, she at first moved in the wrong direction. Eventually she came to the overhead expressway near Quincy Market. As she searched for her vehicle, two men approached and introduced themselves as "Tony" and "Paul."[3] In circumstances which caused the victim to become increasingly apprehensive because no other people were around, they started to walk with her as she tried to find her vehicle. By then, she realized that

---

[2] The Appellate Division of the Superior Court modified these sentences to terms of thirty to sixty years and dismissed the other appeals from sentences.

[3] The victim from photographs and at trial identified the taller man as Giacalone and the shorter one as Quarto. During the three to four hours she was with the two men, she heard one defendant, by inadvertence, call the other "David." During oral intercourse with each of the defendants, the victim noticed that Giacalone had been circumcised. Quarto, so the victim also noticed, had not been circumcised. These physical facts were stipulated during trial.

she "was stuck with them" and "had no way out." Before she found her vehicle, the men had asked her to drive them to their automobile. When she did find her own vehicle they climbed into the front seat.

The victim (all as directed by her passengers) then drove them to East Boston through the Callahan Tunnel, made several turns, and stopped at last in a dead end street. There Giacalone by force took the motor vehicle keys and drove the vehicle to an empty lot on the edge of the harbor.

Quarto pulled a knife and ordered the victim into the back seat and told her to have sexual intercourse with Giacalone. There Giacalone had both vaginal and oral intercourse with the victim. Giacalone then drove the victim's automobile toward Route 128 with the victim in the back seat with Quarto, who forced her to perform fellatio upon him. At some stage of the ride, Quarto cut off a clump of her hair, slashed her arms and knees with the knife, stabbed her in the hip, and left the knife in her hip until she asked him to take it out.

At one time Giacalone stopped the automobile and left it momentarily. The victim tried to escape but was prevented by Quarto. Giacalone then drove back to a pier in East Boston. At the pier, the victim was told to get out of the vehicle. The men led her along the edge of the pier. She broke loose temporarily and was knocked to the ground. Quarto repeatedly kicked her in the face. She probably lost consciousness but woke up in the water twenty feet or so below the level of the pier. With face swollen, and both bleeding and bruised (as shown by exhibits in the case), she waded ashore and found a security guard in a shack outside the Boston Shipyard Company.

The guard called the victim's mother and the police. The police arrived about 6 A.M. on December 4. She was taken to Massachusetts General Hospital. There she was first interviewed by the police at 7:45 P.M.[4] She was unable to identify

---

[4] The victim described the shorter man as a white male, five feet two to three inches tall, of medium build, wearing a brown vinyl jacket. The taller man, she described as a white male, Italian, about five feet six inches tall, weighing 155 pounds, with short brown hair and brown eyes, and wearing a maroon jacket.

her assailants from an array of twelve photographs which contained no picture of either defendant. A detective went to the hospital the next day but could not interview her because she had not recovered sufficiently. The victim was told, however, to go to a named police station, when released from the hospital, to look at photographs of others.

This she did with her father on December 13, 1983. She did not identify anyone in four books, each of which contained about 200 photographs of white males. She started on a fifth book of "Hispanic" men and women. At the nineteenth photograph she exclaimed, "Oh my God, that's him!" The photograph was of Quarto. The next day, Detective Charles P. Gleason in charge of the investigation of the victim's case, showed her another book containing about 120 pictures, told her to start at photograph numbered forty-five. At number seventy-eight, she said, "[T]hat's him."[5] It was a photograph of David Giacalone. Later at the probable cause hearing and at trial the victim identified each defendant as one of her attackers.

The victim never saw her automobile again after she left it in the possession of her two passengers near the East Boston pier. Other witnesses testified (subject to defense objections) that the vehicle was recovered, completely burned, at a point in East Boston about two to three minutes' walk from the house of each defendant.

On appeal the defendants by counsel do not dispute that the victim was treated by two persons essentially as her testimony indicated (that is, that she "was beaten, was raped, was kidnapped, was robbed"). They contest, however, her identifications of these defendants as her assailants. They raise various questions which they contend bear upon the principal issue of the reliability of her identifications.[6]

---

[5] Detective Gleason had known Giacalone and Quarto and had seen them together frequently in East Boston. He knew that they lived near each other and near the area where the victim was raped.

[6] At trial there was testimony from a Boston police department "criminalist" of some nineteen years' experience and good training. He had examined by chemical methods and otherwise various items of clothing of the victim and contents of a rape kit prepared at the hospital. Except to

1. In pretrial motions, Giacalone and Quarto each sought to have an inspection in camera by a judge of the victim's psychiatric and mental health records. On February 15, 1985, a Superior Court judge (other than the trial judge) proceeded to determine whether these records contained material which would be of assistance to counsel in impeaching the victim's identification testimony. That judge ruled that no sufficient showing had been made to her to justify an order that such material concerning the victim be examined in camera. The judge had seen and heard the witness testify and had observed in her no lack of mental capacity to testify with clarity or of likelihood that, at the time of the attack, the victim in any respect was disabled from making accurate observations.[7]

The motion judge had adequate basis for concluding that no sufficient defense showing had been made to justify resort to the victim's psychiatric records under the provisions of G. L. c. 233, § 20B (disclosures by a patient to a psychotherapist), and § 20J (disclosure to a rape crisis counselor). The same request was made of the trial judge just before the trial was commenced on March 19, 1985. He also denied the requested in camera examination. We hold that, as the situation then stood, this denial was reasonable because of the inadequate preliminary showing. See *Commonwealth* v. *Two Juveniles,* 397 Mass. 261 (1986), especially at 266 (where § 20J is re-

---

the limited extent that cuts in the victim's clothing were consistent with having been made with a knife and that a preliminary test of a gauze wiping indicated the presence of semen, he had been unable to determine its source or the blood type of that source. The tests were "inconclusive" so far as being an aid to identification of the attackers.

[7] At one stage of the pretrial motions, the motion judge ordered the victim's psychiatric records produced on the ground that the prosecution had agreed to do so at the pretrial conference. The motion judge rescinded the order the next day after rereading the pretrial report. She then concluded that the prosecutor had not made any such agreement.

The motion judge was aware from the victim's very frank pretrial testimony, as were the trial judge and the jury from the victim's testimony at trial, that the victim, prior to leaving for Boston had taken a shot of whiskey and a beer, and had consumed another beer on the way from the North Station to the concert, and had taken one or more puffs of a marihuana pipe passed to her by a young woman sitting next to her at the concert.

ferred to as an "absolute privilege"), and at 267 (discussion of the necessity of a "preliminary" showing). We consider *Pennsylvania* v. *Ritchie,* 480 U.S. 39 (1987), a case decided since the arguments in the present case by a plurality opinion of the Supreme Court of the United States,[8] as permitting the continued application of the principles discussed in the *Two Juveniles* case at 266-269. That Massachusetts decision would permit a trial or motion judge to deny even an in camera inspection of privileged material (G. L. c. 233, §§ 20B and 20J) in the absence of a showing by the defendant of "a legitimate need for access" to the material. 397 Mass. at 269. See also *Commonwealth* v. *Widrick,* 392 Mass. 884, 889-891 (1984), where there is reference to important policy considerations underlying the "rape-shield" statute found in G. L. c. 233, § 21B.

2. The defendants contend that the trial judge improperly instructed the jury on burden of proof and reasonable doubt. In his charge on reasonable doubt, he read the charge approved in *Commonwealth* v. *Little,* 384 Mass. 262, 266-267 & n.4 (1981). This charge contained the same "beyond all reasonable doubt" language italicized and somewhat criticized in *Commonwealth* v. *A Juvenile (No. 2),* 396 Mass. 215, 217 n.2 (1985).[9] This trial judge, however, elsewhere in his instructions, dealt with the problem in impeccable fashion so that the the "jury could have come to no other conclusion but that it was their duty to acquit the defendant[s] if, after hearing all the evidence, they retained a reasonable doubt as to . . . [their] guilt." See the *Juvenile* case, 396 Mass. at 220.

---

[8] There are suggestions (at 480 U.S. 57-58 & nn.14 & 15 of the opinion by Justice Powell) that, under a statute imposing an absolute privilege against disclosure, the result might have been different, and that some preliminary showing of a basis of "materiality" in the constitutional sense may be appropriate.

[9] The language from the *Little* charge (as quoted in 396 Mass. at 217 n.2) was dealt with in the *Juvenile* case in the following words: "Viewing the charge as a whole, we conclude that the isolated utterance of the phrase at issue, although regrettable, did not vitiate the adequacy of the reasonable doubt instructions." 396 Mass. at 219. It should be noted that the *Juvenile* case was decided over seven months after the charge in the present case.

3. After the defendants had been convicted, the trial judge, at a sentencing hearing on April 10, 1985, denied a mistrial requested by defense counsel because of the prosecution's failure to produce before trial a Boston police department report (attached to the presentencing probation report) containing some variations from the victim's description of Giacalone given by her to the police. The principal variation was that the victim had testified (see note 4, *supra*) that the taller of her two attackers was five feet six inches in height, whereas this report (together with Detective Gleason, in his testimony, and the arrest report) stated that Giacalone's height was five feet ten inches. The victim was questioned at trial on this difference between her estimate of Giacalone's height and what was shown at trial. So was Detective Gleason. If the report in fact was not furnished seasonably to defense counsel, it was completely harmless error. The discrepancy of height description was clearly visible to the jury. It was referred to by Giacalone's trial counsel in his final argument. Whether it was exculpatory in fact was an issue thoroughly discussed before the jury and for them to determine. The jury obviously were in a position to determine whether the difference between the victim's estimate of Giacalone's height and his actual height, observed by all in the court room, affected the victim's credibility.

4. The defendants argue that the trial judge erroneously admitted over objection hearsay evidence concerning the location and condition of the victim's automobile when found. Robert Van Hine, the security guard at Boston Shipyard Company, first saw the victim about 5:50 A.M. on December 4, 1983, after she emerged from the water in which she found herself. He testified (in part at least over defense objection) that he had made a memorandum in his log that the victim's automobile had been recovered in East Boston. Detective Gleason testified (subject to objection) that he, as the officer in charge of the investigation of the attack on the victim, had learned that the automobile had been found at Bremen and Prescott Streets, East Boston, within "two or three minutes [walk] at the most" from the defendants' houses, completely

burnt. Similar testimony was given (subject to objection) by Detective George Costigan (at one time part of the investigation team). He had received the information while at the police station from the officers who had recovered the victim's vehicle. On cross-examination by Giacalone's attorney (and without objection from anyone), Detective Costigan (who had started work on the case on December 4) testified that he then knew the vehicle had been recovered. Defense counsel then brought out at various times during cross-examination of police witnesses that, because of the condition of the vehicle, they had not made a search of the victim's vehicle for fingerprints or other evidence.[10] Indeed, in final arguments, counsel for each defendant made mention of the circumstance that no police officer investigating the attacks on the victim had examined the vehicle. For example, one defense lawyer referred to the investigation as "lousy. There was no effort made . . . to obtain physical evidence . . . [either] to . . . include or exclude my client . . . ."

We consider the case as a whole[11] to determine whether the admission of this evidence (about the final fate of the vehicle) was of sufficient importance to have had "other than a very slight effect on the verdict of the jury."[12] See Commonwealth v.

[10] Detective Gleason also was asked by the prosecutor whether any efforts had been "made to . . . gain any evidence from the interior of" the automobile discovered approximately three minutes' travel time from the defendants' houses. Detective Gleason replied that no such efforts had been made.

[11] We assume that the disputed evidence was not within any usual exception to the hearsay rule. The situation may have been one where, on a minor aspect of the case, the prosecutor "was entitled to present as full a picture as possible of the relevant events" of the night of December 3-4, 1983. See Commonwealth v. Drew, 397 Mass. 65, 79 (1986), and cases cited. The trial judge may have supposed this incidental fact would be proved later by a witness with direct knowledge. Liacos, Massachusetts Evidence, 442-444 (5th ed. 1981). As the trial proceeded, defense counsel in cross-examination asked questions which seemed to assume the accuracy of the disputed evidence.

[12] The prosecutor in his summation referred to the evidence that the victim's vehicle was found burned within a short distance of the defendants' houses as in some degree corroborative of the victim's identifications and the destruction of the vehicle or evidence of consciousness of guilt. At the close of the arguments both defense trial counsel objected to this part of the prosecutor's argument and moved for a mistrial, which was denied.

*Royce,* 20 Mass. App. Ct. 221, 229 (1985). By the time the vehicle was recovered, all injuries to the victim had taken place and the disposition of the vehicle was of little relevance.

The Commonwealth's case rested in major degree upon the victim's very positive and convincing identification of both defendants (as already described). On one occasion she had selected a picture of Quarto as her shorter assailant from several hundred photographs. On another occasion she had picked out a photograph of Giacalone from a considerable number of pictures. The evidence that the two persons thus identified were friends and neighbors emphasized the reliability of her selections, as did the fact that one of those picked by her was named "David" despite the defendants' use of false names. This all took place within two weeks of the attack upon her. Her identifications were not shaken by cross-examination or by other testimony.

The defendants present no persuasive contention that admitting the disputed evidence, taking into account all the circumstances, was reversible error. The facts, so far as relevant at all, presumably could have been proved with the assistance of records. See, e.g., G. L. c. 266, § 29. An inadvertent failure to present additional proof through a witness who actually had seen the burned vehicle should not lead to a retrial where there is no indication of any genuine question as to the place where and the condition in which the victim's vehicle was found.

*Judgments affirmed.*