### COMMONWEALTH vs. ROBERT C. BOWIE.

Nos. 85-840 & 86-1234.

Norfolk.   January 21, 1987. — November 18, 1987.

Present: KASS, QUIRICO, & WARNER, JJ.

*Identification. Evidence,* Hearsay, State of mind, Spontaneous utterance. *Practice, Criminal,* Instructions to jury, New trial.

At the hearing on a criminal defendant's motion to suppress photographic and in-court identifications of him, the evidence amply supported the judge's ruling that there was no suggestiveness such as to give rise to a substantial likelihood of misidentification. [74-77]

In a criminal case, there was no error in the judge's allowing as evidence an out-of-court statement made by a person who did not testify at the trial, where the statement was admissible under the excited utterance exception to the hearsay rule. [77-80]

At a criminal trial no reversible error appeared in the judge's jury instructions, taken as whole, on proof beyond a reasonable doubt. [80-81]

The trial judge in a criminal case properly denied the defendant's motion for a new trial where the record supported his conclusion that no "newly discovered evidence" had been offered at the hearing on the motion. [83-86]

INDICTMENTS found and returned in the Superior Court Department on November 28, 1983.

A pretrial motion to suppress evidence was heard by *Roger J. Donahue,* J. The cases were tried before *George N. Hurd, Jr.,* J., and a motion for a new trial was heard by him.

*Jack I. Zalkind* for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. On February 14, 1985, a Norfolk County Superior Court jury convicted the defendant of armed burglary, armed robbery, and breaking and entering in the nighttime and larceny. The trial judge sentenced the defendant to concurrent

terms of ten to twelve years at M.C.I., Walpole (Cedar Junction), for the first two convictions and, with the defendant's consent, placed the third indictment on file. The defendant filed a timely appeal from the convictions. Subsequently, the defendant brought and argued a motion for a new trial and has since appealed its denial. The two appeals were consolidated for briefing and argument before this court.

The defendant raises four contentions: 1) he claims that the court erred in denying his motion to suppress identifications made and to be made by the victim of the crimes; 2) he contends it was error to permit a police officer to testify at trial concerning a statement made to the police by the defendant's girlfriend just prior to the discovery of an incriminating gun in her apartment; 3) he argues that the judge committed reversible error in using the jury instructions found in *Commonwealth* v. *Little,* 384 Mass. 262 (1981), to charge on proof beyond a reasonable doubt; and 4) he claims error in the denial of his motion for a new trial based on newly discovered evidence.

*Trial Evidence.*

The jury could have found the following facts from the testimony at trial. On April 11, 1981, Anthony Felos returned to his house in Stoughton between approximately 8 and 8:30 P.M., when it was dark outside. As he entered his house through an enclosed porch he heard a noise coming from the interior. Thinking that neighborhood children had intruded, he picked up a hammer and proceed to his bedroom, where he encountered two men. One of the men (Burglar 1) was to his immediate left, rifling through a drawer in his dresser; the other (Burglar 2) was crouched eight to ten feet away, perusing the contents of a footlocker at the end of the bed. The room was illuminated by a small table lamp with a low-wattage bulb on the dresser and Felos clearly saw the faces of both men for a period of some seconds. Felos could see from the bedroom doorway that a loaded pistol which he kept under his bed "was not there." When the second, crouching, burglar exlaimed, "Shoot him with that gun," Felos understandably fled. The thieves also fled, following closely behind Felos. All three reached the exterior porch door at about the same time. Felos testified, "It

was almost like three people trying to get out the one door at the same time." Felos turned and threatened Burglar 1 with his hammer, causing him to back off. At this point, Burglar 1 was only inches away, Burglar 2 was within three feet, and Felos could see the faces of both men in the light cast by a "wagon wheel" fixture overhead on the enclosed porch. Felos and the burglars, in that order, abandoned the house, Felos to call the police at a neighbor's house, and the burglars to flee in an automobile parked nearby. Gerald Morrell, who was parked in the lot of a nearby ice cream stand with his family, testified that he saw two light-skinned black men run across the parking lot and jump into the automobile next to his. He testified that the two men both wore long coats and were around six feet tall; one was carrying a bag.[1]

When the Stoughton police arrived, Felos gave a general description of the two burglars: both were non-Caucasian — black or Puerto Rican — both were around six feet tall and had short "Afro" hairstyles. Burglar 1 had a moustache and wore a dark coat; Burglar 2 was clean-shaven and wore a lighter colored jacket or coat. When Felos returned to his house that evening, he found that his door had been jimmied open. He later found nearby a piece of a tool resembling a crowbar. Felos also discovered that a bowling bag and three pistols — a Walther P.P.K. nine millimeter, a Ruger .22 caliber "convertible," and a .25 caliber Beretta — had been taken from his bedroom.

Later that night, Felos was questioned further at the Stoughton police station, where he assisted in preparing a composite drawing of Burglar 1. (Felos did not participate in preparing a composite of Burglar 2.) Felos also looked through two books of photographs compiled by the Stoughton police but was unable to identify any of the pictures as that of either of the men who had broken into his house. Gerald Morrell also helped prepare a composite drawing and unsuccessfully

---

[1] According to Morrell, one of the men had a thin face and goatee. Morrell also testified that the defendant "could have very easily been" the person he saw as the passenger in the automobile that night.

searched through the books of mugshots. The next day, Felos was shown approximately nine other photographs from the files of the Brockton police department but again was unable to make a positive identification.

At 2:30 A.M. on September 9, 1981, several Brookline police officers were dispatched to the Brookline apartment of Thomasina Benson in response to a call indicating there was a disturbance at that apartment and that there might be a man there with a gun. According to the testimony of one of the Brookline police officers, Ms. Benson was in the hall outside the apartment and appeared "very upset." In a low voice, Benson told the officers, "My boyfriend, Robert Bowie, is in the apartment, and he may have a gun." The police entered the apartment and found the defendant in a bedroom. The defendant claimed to have no gun. The officers thereupon searched the apartment and found a Walther P.P.K. nine millimeter pistol secreted under a rug in the living room. In time, it was discovered that the serial number on the pistol matched that of the Walther pistol taken from the Felos residence.

About two months later, the Brookline police transmitted a photograph of the defendant to the Stoughton police. At some point, the Brookline police also sent a letter to Felos informing him they had recovered his Walther P.P.K. Thereafter, on December 24, 1981, a Stoughton detective went to Felos's house and presented Felos with an array of nine photographs which included the Brookline photograph of the defendant. In twenty-four seconds (the time was noted by the detective, who was looking at his watch), Felos picked out the defendant as resembling Burglar 2. The Stoughton detective then stated something to the effect of, "That's the one," and told Felos the police had found one of the missing guns in that man's possession.

In May of 1983, Felos was present in Stoughton District Court for a probable cause hearing (which did not go forward) and identified the defendant as he entered the courtroom and then sat in the audience. Felos testified he thought the defendant resembled the second burglar even though at the time of the probable cause hearing he looked heavier, better dressed, and

wore a moustache. Felos also identified the defendant from the witness stand subsequently when the probable cause hearing did go forward in Stoughton District Court on June 29, 1983, and later at hearings in Superior Court.

Further evidence adduced at trial and the motion hearings will be described where relevant to the issues raised by the defendant.

1. *Denial of the Motion to Suppress Identifications.*

On December 14, 1984, there was a hearing in the Superior Court in Norfolk County on the defendant's motion to suppress "all out-of-court identifications, the in-court identification, and any subsequent identifications" made by Felos. The court heard testimony by Felos and the Stoughton detective who was present at the photographic identification on Christmas Eve, 1981, and at both in-court identifications. The Commonwealth and the defendant submitted briefs and waived arguments. On December 21, 1984, the motion judge found that there was no evidence of suggestiveness on the part of the police and denied the motion.

The defendant contends the identifications made by Felos should have been excluded because they were rendered unreliable by suggestive police procedures. See, e.g., *Commonwealth* v. *Moon*, 380 Mass. 751, 756-759 (1980). He fails, however, to present in the argument section of his brief any factual support from the record for these contentions. In forming his vague argument, it appears that the defendant is relying primarily on evidence presented in support of the motion for a new trial (see *infra*) and not evidence presented in support of the motion to suppress held some eighteen months earlier. Since he has not specified the reasons for his contentions, the defendant's argument to this court falls short of an adequate appellate argument. See Mass.R.A.P. 16(a) (4), as amended, 367 Mass. 921 (1975). Nevertheless, we discuss the issue and hold that the denial of the motion to suppress was correct and amply supported by the evidence adduced at the suppression hearing and reflected in the motion judge's findings of fact, to which we grant great deference. See *Commonwealth* v. *Correia*, 381 Mass. 65, 76 (1980); *Commonwealth* v. *Melvin,*

399 Mass. 201, 204 (1987); *Commonwealth* v. *Crowe,* 21 Mass. App. Ct. 456, 459 (1986).

"The question raised by a motion to suppress identification testimony is not whether the witness was or might be mistaken but whether any possible mistake was or would be the product of improper suggestions made by the police." *Commonwealth* v. *Gordon,* 6 Mass. App. Ct. 230, 237 (1978), quoted in *Commonwealth* v. *Paszko,* 391 Mass. 164, 172 (1984). See *Commonwealth* v. *Dougan,* 377 Mass. 303, 316-317 (1979). In the present case, Felos had ample opportunity and reason to view the defendant's face during the crime and thereafter gave detailed descriptions of the robbers to the police. See and compare *Commonwealth* v. *Correia,* 381 Mass. at 66-67; *Commonwealth* v. *Melvin,* 399 Mass. at 202-203, 205; *Commonwealth* v. *Key,* 19 Mass. App. Ct. 234, 236, 240 (1985). See also *Neil* v. *Biggers,* 409 U.S. 188, 199-201 (1972). Contrast *Commonwealth* v. *Botelho,* 369 Mass. 860, 869-870 (1976). Felos was certain that the defendant's picture was not in any of the arrays he viewed in the Stoughton or Brockton police stations. Compare *Commonwealth* v. *Venios,* 378 Mass. 24, 29 (1979). The motion judge ruled that there was no suggestiveness on the part of the police during the identification of the defendant's picture from the December 24, 1981, photo array. There was no testimony at the suppression hearing that the police detective suggested anything to Felos *before* he picked out the defendant's photograph. Compare *Commonwealth* v. *Libby,* 21 Mass. App. Ct. 650, 655 (1986); *Commonwealth* v. *Johnson,* 24 Mass. App. Ct. 947, 948-949 (1987). (In contrast, there was some equivocal testimony to that effect at the hearing on the motion for a new trial. See part 4, *infra*.) There was no evidence at the suppression hearing that any of the nine photographs in the array was suggestive on its face or in contrast with the other photographs. Compare *Commonwealth* v. *Clark,* 378 Mass. 392, 398-402 (1979) (defendant's picture one of two snapshots arrayed with eleven mugshots); *Commonwealth* v. *Correia,* 381 Mass. at 69, 73 (fourteen photograph array included three pictures of defendant and three pictures of codefendant); *Commonwealth* v. *Melvin,* 399 Mass. at 203-

204 (defendant only one pictured in arm sling); *Commonwealth* v. *Small*, 10 Mass. App. Ct. 606, 608 (1980) (single photo shown); *Commonwealth* v. *Mayo*, 21 Mass. App. Ct. 212, 213-218 (1985) (defendant's picture in four or five successive arrays). See also *Commonwealth* v. *Johnson*, 24 Mass. App. Ct. at 948; and the cases collected in Liacos, Massachusetts Evidence, 253-254 (5th ed. 1981 & Supp. 1985). (There was some evidence of photographic suggestiveness presented at the hearing on the motion for a new trial. See part 4, *infra*.)

The court also held, with ample support from the evidence, that there was no suggestiveness surrounding Felos's unprompted in-court identifications of Bowie in May and June of 1983. Compare *Commonwealth* v. *Cincotta*, 379 Mass. 391, 393 (1979); *Commonwealth* v. *Key*, 19 Mass. App. Ct. at 236-237. Contrast *Commonwealth* v. *Dougan*, 377 Mass. at 316-317. Although statements made to Felos following his initial identification from the array and later views of Bowie's photograph could have influenced the in-court identifications, they did not necessarily create an impermissible likelihood of misidentification in light of the ample opportunity Felos had to observe the defendant while the crime was in progress. See *Commonwealth* v. *Venios*, 378 Mass. at 30; *Commonwealth* v. *Correia*, 381 Mass. at 78-79; *Commonwealth* v. *Toto*, 15 Mass. App. Ct. 941, 941-942 (1983), and cases cited. See also *Neil* v. *Biggers*, 409 U.S. at 199-201; *Manson* v. *Brathwaite*, 432 U.S. 98, 114-115 (1977); Smith, Criminal Practice and Procedure §§ 453-460 (2d ed. 1983). At the hearing there was a full exploration of the circumstances attending Felos's initial view of the burglars and the reliability and fairness of the identifications. See *Commonwealth* v. *Dougan*, 377 Mass. at 316-317; *Commonwealth* v. *Correia*, 381 Mass. at 78-79. "[T]he judge implicitly found that the victim's identification[s] rested upon [his] memory of the crime and [his] view of the photograph[ ]." *Commonwealth* v. *Key*, 19 Mass. App. Ct. at 240. See *Commonwealth* v. *Mayo*, 21 Mass. App. Ct. at 218. The defendant simply failed to meet his burden of showing by a preponderance of the evidence that the identification procedures were "so impermissibly suggestive as to give rise to a very substantial

likelihood of irreparable misidentification." *Commonwealth* v. *Melvin,* 399 Mass. at 205, quoting from *Simmons* v. *United States,* 390 U.S. 377, 384 (1968). See *Commonwealth* v. *Correia,* 381 Mass. at 77-78; *Commonwealth* v. *Key,* 19 Mass. App. Ct. at 239; Liacos, *supra* at 258; Smith, *supra* § 418. Because the record amply supports the judge's ruling that there was no suggestiveness, we need not decide whether the many indicia of the reliability of Felos's identification would independently permit admission of his testimony. See *Manson* v. *Brathwaite,* 432 U.S. at 114; *Commonwealth* v. *Hicks,* 17 Mass. App. Ct. 574, 576-578 (1984); *Commonwealth* v. *Key,* 19 Mass. App. Ct. at 239; *Commonwealth* v. *Crowe,* 21 Mass. App. Ct. at 467-468. Compare *Commonwealth* v. *Correia,* 381 Mass. at 81, and cases cited; *Commonwealth* v. *Melvin,* 399 Mass. at 205 n.6.

2. *Testimony on the Out-of-Court Statement of Thomasina Benson.*

At trial the prosecutor called and questioned Brookline police officer Kenneth Lennon concerning the events surrounding the recovery of the Walther pistol in Thomasina Benson's Brookline apartment. Lennon testified that he and several other Brookline police officers were dispatched to 80 Francis Street at about 2:30 A.M. on September 9, 1981. Once there, they met Thomasina Benson in the hallway outside of her apartment. She "was very upset, and she was . . . trying to keep a low voice because she didn't want anyone to hear what she was saying." The prosecutor sought to have the officer testify about what Ms. Benson said. Upon objection by defense counsel, the prosecutor stated at side-bar that he expected the officer to testify that Benson said, "My boyfriend is in the apartment, and he has a gun," and that he was offering the statement so the jury could "understand what the state of mind of the police officer was." The trial judge sustained the objection at that point. Thereafter, during cross-examination of Lennon, defense counsel elicited testimony about the excluded conversation, including a positive response to a question whether Ms. Benson had "already told you that [the defendant] was her boyfriend." On redirect, the prosecutor confirmed this answer and attempt-

ed to elicit from Lennon the rest of Ms. Benson's hallway statement. The defense objected and a colloquy followed, during which the defense counsel argued that the first part of Benson's statement (that the defendant was her boyfriend) was admissible as a "set up for the officer's state of mind."[2] The prosecutor countered that "in fairness . . . since [the defense] opened it up, the jury shouldn't be allowed to get half of the loaf; they should get the whole loaf." The judge then overruled the objection and Officer Lennon testified that Benson had said, "My boyfriend, Robert Bowie, is in the apartment, and he may have a gun." There was no limiting instruction requested or given.[3] Thomasina Benson did not testify at the defendant's trial.

The defendant now argues that admission of Officer Lennon's testimony concerning Benson's statement was error because it was irrelevant and hearsay not within any exception. We agree with the defendant that the testimony was irrelevant as it bore upon the officer's state of mind. We do note, however, that the defendant's attorney himself argued that the first part of the statement was admissible to explain the officer's state of mind. We do not decide whether the testimony was admissible under the doctrine of verbal completeness (see *Commonwealth* v. *Watson,* 377 Mass. 814, 824-834 [1979]; 7 Wigmore, Evidence §§ 2094-2099 [Chadbourne rev. 1976]) because we conclude the statement was properly admitted as a spontaneous exclamation. Compare *Commonwealth* v. *Harris,* 376 Mass. 201, 206 (1978) ("[W]e conclude that the evidence was properly admitted regardless of whether the reason stated by the judge was correct"). See also *Commonwealth* v. *Rivera,* 397 Mass. 244, 248 (1986).

Under the spontaneous exclamation or excited utterance exception to the hearsay rule, "a statement is admissible if its

---

[2] Presumably he elicited the testimony about that part of the statement as a basis for showing that the officers should have arrested the defendant or questioned him more closely when he told them, in contradiction of Bensons's statement, that he and Benson were married.

[3] Officer Lennon went on to testify that the dispatcher had originally informed the officers, "There's a disturbance [at 80 Francis Street]; a man may be there with a gun."

utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize and explain the underlying event." *Blake* v. *Springfield St. Ry.*, 6 Mass. App. Ct. 553, 556 (1978), quoted in *Commonwealth* v. *Fuller,* 399 Mass. 678, 682 (1987). There must be a showing that "an event produced a state of nervous excitement during which the statements concerning the precipitating event were made." *Commonwealth* v. *Fuller,* 22 Mass. App. Ct. 152, 155 (1986), *S.C.,* 399 Mass. 678 (1987). "[T]he statements need not be strictly contemporaneous with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated . . . . [T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances." 6 Wigmore, Evidence § 1750, at 203 (Chadbourn rev. 1976). See *Rocco* v. *Boston-Leader, Inc.,* 340 Mass. 195, 196-197 (1960); *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 223 (1973); *Commonwealth* v. *Williams,* 399 Mass. 60, 69 (1987). Such statements are considered inherently trustworthy if made under "a stress of nervous excitement . . . which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock." 6 Wigmore, *supra* § 1747, at 195. "The issue is whether reasonable 'indicia of reliability' support the statement's admissibility." *Commonwealth* v. *Fuller,* 399 Mass. at 683.

The evidence was sufficient to warrant the conclusion that Benson's statement constituted an excited utterance. Preferably the trial judge should make preliminary findings to that effect. *Commonwealth* v. *McLaughlin,* 364 Mass. at 224. In this case, there was competent and uncontradicted testimony that Thomasina Benson was extremely upset at the time she made the statement at issue. She had obviously been frightened by the disturbance which brought the Brookline police to her apartment. When the police arrived, Benson was in the hallway outside of her own apartment. She spoke in a whisper so that whoever was inside would not hear what she said. It is evident

that she had been frightened in some manner by her "boy-friend," the defendant, and particularly by the possibility that he might have a gun. Her utterance to the police was prompted by the very circumstances which caused her nervous excitement; it was made while she was still under the sway of that exciting influence and it tended to explain the underlying event. Compare *Commonwealth* v. *Hampton,* 351 Mass. 447, 449 (1966); *Commonwealth* v. *McLaughlin,* 364 Mass. at 215; *Commonwealth* v. *Sellon,* 380 Mass. 220, 229 (1980); *Commonwealth* v. *Fuller,* 399 Mass. at 683; *Commonwealth* v. *Doherty,* 23 Mass. App. Ct. 633, 635 (1987). Her statement was not only an unpremeditated explanation of her own condition, but was also an impromptu warning to the police of the danger which had already manifested itself to her. Benson's statement was admissible "as a spontaneous exclamation made during a rapidly developing incident in circumstances reasonably negating premeditation." *Commonwealth* v. *Clary,* 388 Mass. 583, 589 (1983). See *Commonwealth* v. *Rivera,* 397 Mass. at 247-248. There was no error in allowing the testimony.

3. *The Instruction on Proof Beyond a Reasonable Doubt.*

The trial judge incorporated into his jury instructions the instruction on reasonable doubt which was reproduced in *Commonwealth* v. *Little,* 384 Mass. at 266 n.4.[4] The portion of that instruction which states that the Commonwealth need not prove guilt "beyond all reasonable doubt" was a misstatement of the Commonwealth's burden of proof. Following those instructions, the defendant's attorney objected to that portion of the charge and specified the grounds for his objection. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979).

Since the defendant's trial, the Massachusetts appellate courts have advised that the portion of the *Little* charge at issue may constitute error and ought to be avoided. See *Commonwealth* v. *A Juvenile (No. 2),* 396 Mass. 215, 217-220 (1985); *Commonwealth* v. *Giacalone,* 24 Mass. App. Ct. 166, 171 & n.9 (1987). The courts, however, have found use of that isolated

---

[4] In *Little,* the Supreme Judicial Court upheld that instruction in the face of a challenge to a portion of the instruction not here relevant. 384 Mass. at 266-267 & n.5.

phrase in the instruction to be harmless error if offset by other portions of the charge so that, taken as a whole, the instructions clearly and unequivocally informed the jury of the Commonwealth's true burden. See *Commonwealth* v. *A Juvenile (No. 2),* 396 Mass. at 218-220; *Commonwealth* v. *Gonzalez,* 22 Mass. App. Ct. 274, 282 (1986); *Commonwealth* v. *Giacalone,* 24 Mass. App. Ct. at 171. Such was the case here: in addition to reciting correctly the untainted portions of the *Little* charge (including language derived from *Commonwealth* v. *Webster,* 5 Cush. 295, 320 [1850]), the trial judge repeatedly reminded the jury that the Commonwealth had to prove each element of each crime beyond a reasonable doubt. Moreover, he carefully charged the jury on the presumption of innocence. Contrast *Commonwealth* v. *Pickles,* 393 Mass. 775, 779 n.5 (1985). There was, therefore, no error requiring reversal. The one isolated misstatement could not have led the jury astray because the trial judge, "elsewhere in his instructions, dealt with the problem in impeccable fashion so that the 'jury could have come to no other conclusion but that it was their duty to acquit the defendant[ ] if, after hearing all the evidence, they retained a reasonable doubt as to . . . [his] guilt.'" *Commonwealth* v. *Giacalone,* 24 Mass. App. Ct. at 171, quoting from *Commonwealth* v. *A Juvenile (No. 2),* 396 Mass. at 220.

4. *Denial of the Motion for a New Trial.*

One year and two months after the verdicts in this case, the defendant moved for a new trial. See Mass.R.Crim.P. 30(b) & (c), 378 Mass. 900-902 (1979). In support of his motion he submitted the following material which he claimed was newly discovered evidence: 1) the results of a polygraph examination of the defendant (which the court had not ordered); 2) a letter written by Felos claiming that he was unsure of his identification of the defendant and that he had felt pressured by the police to make the identification; 3) an attested statement by Thomasina Benson revealing that, on the night the gun was recovered from her house, she had held a party attended by, among others, Barry DeSilva, who she knew had been asked to leave another party because he was carrying a gun, that after her party she had an argument with the defendant and he struck her, that she asked a concerned friend to get assistance,

and that she did not see the defendant with a weapon in his possession that evening; 4) an affidavit by defense counsel averring that DeSilva was convicted of manslaughter in 1983 (after the Felos robbery) and had committed the crime with a .25 caliber handgun similar to one of the guns stolen from Felos; 5) the affidavit of James Mills, a private investigator, declaring that he showed Felos pictures of Barry DeSilva and Walter Bradley, and that Felos stated DeSilva looked like Robber 1 and Bradley looked like Robber 2; 6) an affidavit by Felos stating, "As reflected in my testimony, I was quite unsure of the identification [of the defendant]" and that the photograph of Bradley "looks like 'Intruder 2' whom I previously thought was [the defendant]"; and 7) the pictures of Barry DeSilva and Walter Bradley which Mills showed to Felos.

On June 27, 1986, the trial judge presided over a hearing on the new trial motion. Felos testified that he had been informed of the recovery of his weapon by the Brookline police before he picked the defendant's picture from the array. He stated that he had not noticed any "marking" on the array photo of the defendant indicating it came from the Brookline police department, although he did remember there were placards hanging around the necks of some of the men pictured in the array.[5] Felos then testified that he could not be sure it was the defendant who had been in his home, that "there was always a reasonable amount of doubt in my mind concerning the identification [of the defendant]," and that he felt "influenced" and "pressured" by the police to make an identification. He revealed that the police told him at the first probable cause hearing that the defendant "had a record as long as his arm." He also said that his initial doubt about the identification was "going to stay the same" and had not increased after he saw Walter Bradley's picture. During the direct examination of Felos, Barry DeSilva

---

[5] The photographs in evidence at the motion hearing apparently had white tabs covering placards which were hanging from the necks of some of the men pictured; Felos testified there were not white tabs on the photos during his view of the array. In the picture of the defendant used in the array, there is a placard hanging from the defendant's neck indicating the picture was taken by the Brookline police department on June 1, 1981. The photograph was presented to this court with a white tab partially covering that placard.

was brought into the courtroom. Felos testified that he had never seen DeSilva before and that he did not look like either of the men who were in his house on the night of the burglary.

Under cross-examination, Felos stated the police "might have said something" prior to his view of the array, that "[s]omething in my mind recalls that something was said before the photographs were shown . . . ." Nevertheless, he testified that in making the initial identification he had focused on the facial features in the photographs and had identified the defendant based on his own recall, and that he had testified at trial as carefully and truthfully as possible. On redirect, he said he did not remember what was on the placards in the photographs.

Barry DeSilva then testified briefly: he admitted he had been convicted of manslaughter, had used a .25 caliber automatic handgun to kill the victim, and had then thrown the gun away. After DeSilva testified, the defendant's attorney expressed his client's willingness to take a court-authorized polygraph examination; when the judge informed him such a test would be of no help in ruling on the motion for a new trial, defense counsel replied, "I respect your wishes, your Honor."

The judge denied the motion in a memorandum which concluded that none of the matters presented on the motion was "newly discovered evidence" which entitled the defendant to a new trial. The judge made careful findings and concluded that Felos was not improperly pressured into testifying and had not, in fact, recanted his previous testimony. On appeal, the defendant argues that the motion judge clearly abused his discretion in denying the motion and urges this court independently to assess the record, particularly the new photographic evidence. See *Commonwealth* v. *Woods,* 382 Mass. 1, 8-9 (1980); *Commonwealth* v. *Vaughn,* 23 Mass. App. Ct. 40, 43 (1986). We agree with the judge's evaluation of the evidence and affirm his denial of the motion.

"A motion for a new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial judge." *Commonwealth* v. *Little,* 384 Mass. at 268-269, and cases cited. *Commonwealth* v. *Hennessey,* 23 Mass. App. Ct. 384, 386 (1987), and cases cited. A defendant seeking a new trial

on such grounds must present evidence to the court which was "unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial . . . ." *Commonwealth v. Grace,* 397 Mass. 303, 306 (1986). *Commonwealth v. Williams,* 399 Mass. 60, 64 (1987). *Commonwealth v. Markham,* 10 Mass. App. Ct. 651, 654 n.1 (1980). "It is well settled that a party cannot reserve for a motion for a new trial a point that he could have raised at the trial." *Commonwealth v. Doyle,* 323 Mass. 633, 638 (1949). *Commonwealth v. Little,* 384 Mass. at 269-270, and cases cited. The new evidence must be "material and credible" and "must carry a measure of strength in support of the defendant's position" which "casts real doubt on the justice of the conviction." *Commonwealth v. Grace,* 397 Mass. at 305. See *Davis v. Boston Elevated Ry.,* 235 Mass. 482, 495 (1920) (new evidence must be "weighty and of such nature as to its credibility, potency, and pertinency to fundamental issues in the case as to be worthy of careful consideration"). In evaluating evidence offered on a motion for a new trial, a judge is entitled to make use of his knowledge of what occurred at trial and to assess questions of credibility. *Commonwealth v. Brown,* 378 Mass. 165, 172 (1979). *Commonwealth v. Ortiz,* 393 Mass. 523, 536-537 (1984). Consequently, a reviewing court will accept the motion judge's findings if warranted by the evidence and will give substantial deference to his ultimate conclusions. *Commonwealth v. Brown,* 378 Mass. at 171. The denial of a motion for a new trial will be reversed only if there was an abuse of discretion which would result in manifest injustice. *Commonwealth v. Brown,* 378 Mass. at 171. *Commonwealth v. Grace,* 397 Mass. at 307. *Commonwealth v. Thomas,* 399 Mass. 165, 167 (1987).

In the present case, the judge's findings are well supported by the record. All of the evidence submitted in support of the motion was available to the defense at the time of trial. There is no showing that Thomasina Benson could not have been called as a witness at trial or that the presence of DeSilva at Benson's party could not easily have been discovered. The showup of DeSilva at the motion hearing and DeSilva's own testimony that he had possessed a gun similar to one of the guns taken from Felos's house were at best inconclusive.

Nothing in Felos's affidavit or testimony was newly discovered in the sense that it could not have been elicited by diligent cross-examination at the earlier trial; in fact, Felos *had* expressed some uncertainty beginning at the time of the first identification. The judge carefully considered Felos's testimony at trial and at the motion hearing and decided that Felos was at all times "an extremely conscientous witness." The judge found that Felos's letter "in no way constituted a recantation of his previous testimony."[6] Nothing in Felos's affidavit or hearing testimony directly contradicted his testimony at trial. Despite the statement in his affidavit that the photograph of Walter Bradley "looks like 'Intruder 2,' whom I had previously thought was Mr. Bowie," Felos testified at the hearing that any doubts he originally had about his identification of the defendant were not increased by his posttrial exposure to the photograph of Bradley. Felos also testified at the motion hearing that his trial testimony was truthful, carefully considered, and based on his recall of the crime. Felos testified that he may have been influenced by a police statement at the initial photo identification of the defendant, but he equivocated when asked whether the statement came before or after he had selected the defendant's photograph. Felos stated unequivocally that he had not been influenced by any information on the placards around the necks of the men pictured in the array; consequently, even though Felos was aware that the Brookline police had recovered some of the stolen property, the judge could find credible Felos's testimony that this awareness did not at all influence his selection of the defendant's photograph.

"[B]y reason of presiding over the trial, the judge was in the best possible position to weigh the credibility of the proffered evidence and to assess its probable impact on a jury hearing it together with other evidence which had actually been presented." *Commonwealth* v. *Brown,* 378 Mass. at 172. See

---

[6] Even if a witness expressly recants his testimony (as did *not* happen here), "[t]he possibility that the recantation or newly discovered evidence might affect the result of the trial does not necessarily require the granting of a new trial." *Commonwealth* v. *Robertson,* 357 Mass. 559, 562 (1970). See *Commonwealth* v. *Tobin,* 392 Mass. 604, 618-619 (1984).

*Commonwealth* v. *Markham,* 10 Mass. App. Ct. at 655; *Commonwealth* v. *Siciliano,* 19 Mass. App. Ct. 918, 919 (1984). None of the evidence offered in support of the motion casts real doubt on the justice of the convictions; therefore, the judge did not abuse his discretion when he denied the defendant a new trial. *Commonwealth* v. *Grace,* 397 Mass. at 305.

Because there was no reversible error in the denial of the motion to suppress, in the conduct of the trial, or in the denial of the motion for a new trial, we affirm the convictions.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*