COMMONWEALTH vs. JOHN E. MAY, JR.
(and three companion cases[1]).

No. 88-P-145.

Franklin. June 6, 1988. — January 24, 1989.

Present: GREANEY, C.J., BROWN, & PERRETTA, JJ.

*Joint Enterprise. Evidence,* Other offense, Relevancy and materiality, State
of mind, Common criminal enterprise, Admissions and confessions.
*Practice, Criminal,* Instructions to jury, Required finding. *Armed Assault
with Intent to Rob. Receiving Stolen Goods. Firearms.*

At the trial of an indictment charging a defendant, as a joint venturer, with
armed assault with intent to commit robbery, there was no error in
admitting in evidence the defendant's statement to an acquaintance that
he had stolen the gun used by a companion in the assault, where the
statement was probative of his participation in the joint venture in that
it was indicative of his knowledge that his companion was armed, and
where the statement contradicted the notion, later raised by defense
counsel in closing, that the defendant was simply doing what his com-
panion, who was armed, ordered him to do. [805]
At a criminal trial, the judge's instructions to the jury defining proof beyond a
reasonable doubt, taken as a whole, created no substantial risk of a
miscarriage of justice. [806]
At a criminal trial, the Commonwealth met its burden of proving that a
defendant was a joint venturer in an armed assault with intent to commit
robbery. [806]
At the trial of an indictment for receiving stolen property, based upon a de-
fendant's receipt of the gun used in an armed assault, the defendant was
entitled to a required finding of not guilty, absent evidence that he had
actual knowledge that the gun was stolen. [806-808]

INDICTMENTS found and returned in the Superior Court De-
partment on October 20, 1986.

The cases were tried before *William W. Simons, J.*

[1] The three companion cases are against Leman B. Farrar, II. A third
confederate, Jerry Hamel, pled guilty prior to trial.

*Robert B. Carlsen* for Leman B. Farrar, II.

*Pierre E. Rodrigue,* Assistant District Attorney, for the Commonwealth.

*Regina Zupan,* Committee for Public Counsel Services, for John E. May, Jr., submitted a brief.

PERRETTA, J.   At about 9:30 P.M., on October 10, 1986, the defendant Farrar was driving from Phillipston to Orange with the defendants May and Hamel. Hamel was in the front passenger seat, and May was seated behind Farrar. Somewhere in Athol, they picked up a hitchhiker, demanded his money at gunpoint, ordered him from the vehicle, and continued on their way. In Orange, they stopped to visit some friends at their apartment and told them what they had done. When one friend looked out the apartment window and saw a police cruiser driving very slowly by Farrar's parked automobile, the friend asked the three men to leave. The defendants were arrested later that night and indicted on numerous charges.[2] The Commonwealth, however, proceeded against the defendants as joint venturers in respect to only one charge: armed assault with intent to commit robbery. On appeal, May argues that his conviction on this charge is tainted by evidence more prejudicial than probative and by erroneous jury instructions. Farrar claims that the Commonwealth failed to meet its burden of proving that he was a joint venturer as to that charge. We affirm as to both defendants on those indictments. However, because the Commonwealth did not meet its burden of proving that Farrar knew that the gun used in the armed assault was stolen, we set aside Farrar's conviction of receiving stolen property, the gun.

I. *The Facts.*

Lawrence Jones, the victim of the armed assault, testified that he was hitching a ride from Athol to Orange. When the

---

[2] As to May: armed assault with intent to commit robbery, accessory before the fact to armed assault with intent to commit robbery (nol prossed at the trial judge's suggestion), possession of ammunition without a firearm identification card, and receiving stolen property. The two latter convictions were placed on file with May's assent. Farrar was indicted, convicted, and sentenced on charges of armed assault with intent to commit robbery, receiving stolen property, and carrying a gun without a license. The Commonwealth concedes error on the last conviction.

defendants picked him up, he got into the back of the vehicle and sat next to May. Jones's attempts to engage the men in small talk were unsuccessful, and the drive proceeded in silence.

As they were driving along, Jones noticed that Hamel was looking at Farrar and nodding. It seemed at first that Farrar was ignoring Hamel, but then Farrar returned Hamel's nod. Hamel turned in his seat, pointed a gun to Jones's face, and ordered Jones to turn over his money.

When Jones replied that he had no money, May went through his wallet and the contents of his pockets. Jones had nothing of value. As they entered the center of Orange, Hamel ordered Jones to put his head down so that pedestrians would not see him. A short while later, Farrar pulled over and stopped the vehicle to let Jones out. Hamel warned Jones, "If you tell anybody, we are going to come back and kill you." Jones went to his brother's house and immediately notified the police.

Farrar and Hamel had friends in Orange, Alan Abbott and Crystal Cook. After releasing Jones, the men went to Abbott and Cook's apartment. Both Abbott and Cook testified that when the three men came into their apartment, they all looked "happy" and "excited." Hamel was carrying the gun. The two witnesses related that the three men said to them that "we just scared the hell out of somebody."

When pressed by the prosecutor and defense counsel as to which of the three men made that statement, both Abbott and Cook testified that each of them did, all excitedly speaking at once and to the same effect. When Abbott asked what they had done, Hamel described how "he had held the gun" to Jones's head and demanded his money. May and Farrar were present when Hamel recounted the event to Abbott.

May volunteered that he had held a knife to Jones's side, and Abbott asked May where he had obtained the knife. Abbott testified that May told him that he and Hamel took it from a house in Phillipston and that he (May) had worked at that house. He claimed to Abbott that he got the key to the house from a neighbor.

Abbott was then shown a compound bow. He recognized the exhibit as an item which Hamel tried to sell him that night when May and Farrar were present in the room. Abbott was also shown the gun which Hamel had been carrying. While at the apartment, Farrar held the gun "once — maybe more." Hamel removed the clip and asked May for ammunition which May took from his pocket. At that point Abbott told Hamel to put the gun on the coffee table, that he did not want a loaded gun in his house.

When the prosecutor asked Abbott whether Farrar, Hamel, or May had told him what they had been doing earlier in the evening, Abbott answered: "Jerry [Hamel] had told me that they went to Phillipston with Leman [Farrar] to pick up the bow, and on their way back he had shot into the 'Entering Athol' sign and shot a power transmitter."

Abbott also had a conversation with Farrar concerning the events of the evening. Farrar told Abbott that he had telephoned to the house of a mutual friend looking for Abbott's son. Hamel was at the house and spoke with Farrar, asking if he would drive him and May from Athol to Phillipston and back in exchange for gas money. Farrar agreed and picked up Hamel and May at the friend's house. Farrar further described to Abbott how Hamel had shot the gun at a sign and power transmitter on the way back from Phillipston.

At this point in the Commonwealth's case, the trial judge instructed the jury that any statements alleged to have been made by Farrar, May or Hamel could be considered "only as to the defendant who is alleged to have made that statement."

Sometime between 10:30 P.M. and 11:00 P.M., Abbott looked out his window and saw a police cruiser driving down the street. The cruiser stopped at Farrar's automobile. The officer directed a spotlight into the vehicle and then backed down the road. Abbott then told Farrar, Hamel, and May to leave, which they did about ten minutes later.

In addition to her description of Farrar, Hamel and May as they entered her apartment, Cook's testimony was largely corroborative of Abbott's. She did, however, relate that May told her that he had stolen the gun "from someplace in Petersham or

Phillipston, somewhere." The three men left the apartment with May carrying the bow and Hamel the gun.

When the police stopped and arrested the defendants that night, Farrar was driving, Hamel was in the front passenger seat, and May was seated behind Farrar. The gun was on the back floor directly behind the driver's seat.

The owner of the gun testified that he last saw it at his house in Phillipston about October 8, 1986. He recognized May and believed that he might have been in his house in the past as a guest of one of his children. The witness identified the gun, ammunition, bow, and knife as his property.

II. *May's Appeal.*

Neither of May's claims requires lengthy discussion. There is no force to the argument that his statement to Cook, that he stole the gun, was more prejudicial than probative and that the trial judge, therefore, abused his discretion in denying the motion for a mistrial and the motion to strike. Although May recognizes that the statement was probative of his participation in the joint venture in that it was indicative of his knowledge that Hamel was armed (see and compare *Commonwealth* v. *Washington*, 15 Mass. App. Ct. 378, 382-383 [1983]), he claims that proof of his knowledge was sufficiently presented without resort to evidence that he had committed a crime other than those for which he was being tried. He points to the statements that Hamel had shot the gun from the window of the automobile prior to the armed assault.

We think the statement by May had more than "minimal incremental" probative value on the question of his knowledge that Hamel was armed. The statement could be viewed as relevant to the issue of May's knowledge that the ammunition for the gun, taken from the same owner and place as the gun, was stolen and that May received the ammunition knowing it to have been stolen, as charged in the receiving stolen property indictment. Moreover, the statement would contradict any notion that May was simply doing what Hamel, who was armed, ordered him to do, an argument in fact made by defense counsel in his summation. We see no "palpable error." *Commonwealth* v. *Young*, 382 Mass. 448, 462-463 (1981), and cases therein cited.

In defining reasonable doubt for the jury, the trial judge began by giving examples of what does not constitute reasonable doubt. The example of which May complains is the phrase that reasonable doubt is not "proof beyond the probability of innocence." The phrase was an isolated one in an otherwise impeccable charge which included an instruction on the presumption of innocence. Immediately following the passage of which May complains, the trial judge charged the jury in language which substantially tracked *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). He reminded the jury repeatedly throughout his lengthy instructions (necessitated by the number of indictments for their consideration) that each element of each crime had to be proved beyond a reasonable doubt. We see no substantial risk of a miscarriage of justice. See *Commonwealth* v. *Little*, 384 Mass. 262, 266-267 & n.4 (1981); *Commonwealth* v. *Bowie*, 25 Mass. App. Ct. 70, 80-81 (1987).

III. *Farrar's Appeal.*

We think that the Commonwealth met its burden of proving that Farrar was a joint venturer in the armed assault of Jones with the intent to rob him. There was evidence to show that before stopping to pick up Jones, Farrar was well aware of the fact that Hamel possessed a loaded gun. Like Hamel and May, Farrar resisted Jones's attempts at conversations. It was not until Farrar returned Hamel's nod that Hamel immediately turned in his seat, pointed the gun at Jones's head, and demanded his money. Upon entering Abbott and Cook's apartment, he acknowledged his participation with excitement. This evidence was sufficient to put to the jury the question whether Farrar did in fact aid, command, counsel, or encourage the commission of an armed assault with intent to rob, while sharing with Hamel the requisite mental state for that crime. See *Commonwealth* v. *Casale*, 381 Mass. 167, 173-175 (1980), and cases therein discussed and compared. See also *Commonwealth* v. *Giang*, 402 Mass. 604, 608-610 (1988).

There is, however, a serious deficiency in the Commonwealth's proof on the indictment charging Farrar with receiving stolen property, the gun. "The elements of proof 'essential to convict' a defendant of the crime of receiving stolen goods are:

(1) one must buy, receive or aid in the concealment of property which has been stolen or embezzled, (2) knowing it to have been stolen." *Commonwealth* v. *Donahue*, 369 Mass. 943, 949 (1976). The Commonwealth claims that Farrar received the stolen property when he held the gun at the apartment and that he aided in its concealment when he drove May and Hamel with the gun from the apartment after they were asked to leave. See *Commonwealth* v. *Ciesla*, 380 Mass. 346, 349 (1980). See also Perkins & Boyce, Criminal Law 395-398 (3d ed. 1982). We do not consider whether either of these acts is sufficient to constitute receiving or aiding in the concealment of stolen property, because in either event the Commonwealth failed to prove that Farrar knew that the gun was stolen. See *Commonwealth* v. *Dellamano*, 393 Mass. 132, 138-139 (1984).

As we review the evidence, the Commonwealth's proof of Farrar's knowledge rests upon the statements of May and Hamel at the apartment revealing that they had stolen the gun and upon an inference of guilty knowledge drawn from Farrar's possession of the gun while in the apartment. See, e.g., *Commonwealth* v. *Burns*, 388 Mass. 178, 183 (1983). However, in relying upon Hamel and May's admissions to inculpate Farrar, the Commonwealth overlooks the fact that the trial judge had concluded correctly that their statements were made after the joint venture, the armed assault, had come to an end. See *Commonwealth* v. *Andrews*, 403 Mass. 441, 452-454 (1988). The admissibility of each of the statements was limited to its declarant. See *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976); *Commonwealth* v. *Drew*, 397 Mass. 65, 70-71 (1986); *Commonwealth* v. *Griffin*, 19 Mass. App. Ct. 174, 180-181 (1985). There is nothing in Jones's testimony or Farrar's statements to Abbott and Cook which reveals that Farrar had actual knowledge that the gun was stolen property. Further, we do not think that Farrar's handling of the gun "once — maybe more," according to Abbott, rises to the level of sufficient acquisition of possession and control of that item to permit a rational inference of his guilty knowledge. Compare *Commonwealth* v. *Matheson*, 328 Mass. 371, 372-373 (1952);

*Commissioner of Pub. Safety* v. *Treadway*, 368 Mass. 155, 156-160 (1975); *Commonwealth* v. *Burns*, 388 Mass. at 179-180. "Since knowledge is an essential element of the crime, it must be proved beyond a reasonable doubt." *Id.* at 183. It was error to deny Farrar's motion for a required finding of not guilty on this indictment. See *Commonwealth* v. *Scarborough*, 5 Mass. App. Ct. 302, 303-304 (1977), and cases cited therein.

The Commonwealth's concession of error on Farrar's conviction of carrying a firearm without authority is commendable. Farrar is entitled to a required finding of not guilty on this indictment also. See *Commonwealth* v. *Osborne*, 5 Mass. App. Ct. 657, 658-659 (1977); *Commonwealth* v. *Hill*, 15 Mass. App. Ct. 93, 95-97 (1983).

IV. *Conclusion.*

The judgments in indictments no. 86-091 and 86-095 are affirmed. The judgments in indictments no. 86-093 and 86-096 are reversed, the verdicts are set aside, and judgments are to be entered for the defendant Farrar on those indictments.

*So ordered.*